Pedro Cruz **MUNIZ, Appellant,**

v.

The **STATE of Texas, Appellee.**

No. 69602.

Court of Criminal Appeals of Texas, En Banc.

Jan. 6, 1993.

Rehearing Denied Feb. 10, 1993.

Ian Inglis, Austin, for appellant.

Ken Anderson, Dist. Atty., Georgetown, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

CAMPBELL, Judge.

After a trial held in February 1986, a Williamson County jury found appellant, Pedro Cruz Muniz, guilty of the December 20, 1976,[1] capital slaying of a female, J___ B___. The aggravating element of the murder was appellant's aggravated rape of J___ B___.[2] At the trial's punishment phase, the

---

1. Appellant was originally tried and convicted for this offense in 1977. This Court affirmed the trial court's judgment and sentence of death. *Muniz v. State,* 573 S.W.2d 792 (Tex.Cr.App. 1978). Subsequently, the Fifth Circuit Court of Appeals granted habeas corpus relief and ordered a new trial. *Muniz v. Procunier,* 760 F.2d 588 (5th Cir.1985). Appellant was retried in 1986 under the original indictment, and again received a sentence of death.

2. The relevant language from the indictment read that appellant "did then and there intentionally cause the death of an individual, [J___ B___], by hitting and striking her with an object, the description of which is unknown to the

jury answered affirmatively the punishment issues set forth in Article 37.071(b) of the Texas Code of Criminal Procedure,[3] and appellant was sentenced to death. Direct appeal to this Court was then automatic under Article 37.071(h).[4] We will affirm.

In eighteen points of error, appellant challenges: the application of the capital punishment statute to his situation; the sufficiency of the evidence to support the jury's verdict concerning both his guilt and the affirmative answer to the second punishment issue; the validity of his arrest; the admission in evidence of his confession; the trial court's refusal to submit to the jury a charge regarding the voluntariness of appellant's confession and a definition of the term "deliberately" contained in the first punishment issue; the trial court's admission, at the punishment phase, of evidence of appellant's two prior misdemeanor convictions; the trial court's refusal to instruct the jury at the punishment phase to consider all mitigating evidence; the constitutionality of Texas' capital punishment statute both facially and as it was applied to appellant's case; the second[5] prosecution of this case as a violation of the double jeopardy provisions of the Texas and United States constitutions; the exclusion of Mexican–Americans from the grand jury that indicted appellant; and the adequacy, under the Texas and United States constitutions, of his counsel's assistance throughout the course of the trial. After addressing appellant's points of error which challenge the application of the capital punishment statute to his situation and the sufficiency of the evidence pertaining to both his conviction and the affirmative answer to the second punishment issue, we will address the remainder of appellant's points of error in the order in which they occurred during the course of the trial.

In point of error one, appellant argues that the evidence at trial was insufficient to sustain his conviction because the evidence proved that his "act of causing serious bodily injury or attempting to cause death was one and the same with his act of causing the victim's death." According to appellant's argument, the State relied upon a single act to prove both J— B—'s murder and the aggravating element of the rape. Appellant contends that this conduct by the State "constitutes an improper use of the felony murder statute." Therefore, before addressing appellant's sufficiency point, we must interpret the applicable statute.

At the time of the offense, the pertinent portions of Texas Penal Code § 19.03(a)(2) read "[a] person commits [a capital] offense if he commits murder [by intentionally or knowingly causing the death of an individual] in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated rape, or arson; ..."[6] See 1973 Tex.Gen.Laws 1123. In order to commit aggravated rape, the perti-

---

Grand Jury; and that said Pedro Cruz Muniz was then and there in the course of committing and attempting to commit aggravated rape, against the peace and dignity of the State."

3. At the time of appellant's trial, Article 37.071 provided in relevant part:
 (b) On conclusion of the presentation of the evidence [at the punishment phase], the court shall submit the following three issues to the jury:
 (1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;
 (2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and
 (3) if raised by the evidence, whether the conduct of the defendant in killing the de-

ceased was unreasonable in response to the provocation, if any, by the deceased.
 (c) The state must prove each issue submitted beyond a reasonable doubt, and the jury shall return a special verdict of "yes" or "no" on each issue submitted.
The record reflects that only issues (b)(1) and (b)(2) were submitted to the jury with respect to appellant's conduct in murdering J— B—.

4. Unless otherwise indicated, all article references are to the Texas Code of Criminal Procedure.

5. See footnote one, supra.

6. The only change in the current version of the penal code section involves the term "aggravated rape," which is now addressed as "aggravated sexual assault." See 1983 Tex.Gen.Laws 5315.

nent portions of Texas Penal Code § 21.03 [7] required that a person commit rape and cause "serious bodily injury ... in the course of the same criminal episode." See 1973 Tex.Gen.Laws 883. The penal code defines "serious bodily injury" as bodily injury that causes death, creates a substantial risk of death, or causes serious permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ. Texas Penal Code § 1.07(34).

Reading penal code §§ 1.07(34), 19.-03(a)(2) and 21.03 [8] in conjunction, in order to obtain a capital murder conviction, the State must prove that the accused:

(1) raped the victim, and

(2) caused serious bodily injury ... in the course of the same criminal episode, and

(3) killed the victim in the course of committing or attempting to commit the rape.

Appellant interprets the statutes involved so as to require the State to prove that a murder was committed temporally separate from the aggravated rape. Appellant contends that the statute was improperly applied to him because the State could not prove an aggravated rape of J__ B__ separate from the murder of J__ B__.

■ When we interpret any statute, we try "to effectuate the 'collective' intent or purpose of the legislators who enacted the legislation." *Boykin v. State*, 818 S.W.2d 782, 785 (Tex.Cr.App.1991). Normally, we will accomplish this goal simply by focusing our attention on and discerning the objective meaning of the statute's literal text at the time of its enactment. *Id.* In the majority of situations, this exercise will yield an end result of effectuating the intent of the Legislature by giving effect to the statute's plain language. *Id.*

■ We will not, however, give effect to a statute's plain meaning when such an interpretation produces absurd results. *Id.; Faulk v. State*, 608 S.W.2d 625, 630 (Tex.Cr.App.1980). The rationale underlying this exception to the "plain meaning" rule is our refusal to attribute to the Legislature a desire to reach absurd results. *Boykin*, 818 S.W.2d at 785. If a statute may reasonably be interpreted in two different ways, a court may consider the consequences of differing interpretations in deciding which interpretation to adopt. 82 C.J.S. Statutes § 326 (1953). Moreover, if one reasonable interpretation of a statute yields absurd results and another interpretation yields no such absurdities, the latter interpretation should be preferred.

■ In this situation, we conclude that the statute is susceptible to two reasonable interpretations. We also conclude, however, that interpreting the statute in the manner advanced by appellant would lead to absurd results. Three hypothetical examples will precisely illustrate such absurd consequences. First, consider the example of a person charged with a combination of aggravated rape and murder. Appellant's interpretation would require that the conduct which makes the rape aggravated in nature be proven separate from the conduct that caused death.

While such an interpretation is facially attractive, a concrete example demonstrates the absurd consequences such an interpretation yields. Consider the situation where the police find a beaten and raped body and eventually discover the identity of the rapist-murderer. Even though the State could prove that a rape had been committed, that serious bodily injury had been inflicted, and that the victim had been murdered, under appellant's interpretation, the State would never be able to obtain a conviction for capital murder on such facts simply because the evidence could show only that a rape and murder had occurred within a short interval of time. We refuse to believe that the Legislature intended such an absurd result.

The combination of robbery and capital murder also presents problems under the interpretation appellant would have us

---

7. Tex.Penal Code § 22.021 addresses aggravated sexual assault now.

8. See now Texas Penal Code § 22.01(a)(1).

adopt. The pertinent language of the penal code reads:

§ 29.02 **Robbery**

(a) A person commits an offense if, in the course of committing theft as defined in Chapter 31 of this code and with the intent to obtain of maintain control of the property, he:

(1) intentionally, knowingly, or recklessly causes bodily injury to another;

. . .

Should the State's evidence show only that a convenience store clerk was killed by a single gun shot wound to the back, that property had been taken, and that the defendant had fired the fatal shot, the State still could not obtain a capital murder conviction under appellant's interpretation of the statute, absent some surviving witness or videotape of the incident. The State would be precluded from obtaining a capital murder conviction because it would be impossible to prove the elements of the robbery separate from the elements of the murder. The only bodily injury that the State could prove would be the same wound which killed the clerk. Under appellant's interpretation, this single act could not constitute an element of both the robbery and the murder, and the State would be precluded from prosecuting the defendant under the capital murder statute. We do not believe that the Legislature meant to restrict the State's ability to prosecute such a defendant for capital murder.

A similar absurd result is produced if appellant's position is taken to its logical end and arson and murder are combined. At the time of the offense, the pertinent language of the penal code's arson section read:

§ 28.02 **Arson**

(a) A person commits an offense if he starts a fire or causes an explosion:

(1) without the effective consent of the owner and with intent to destroy or damage the owner's building or habitation; or

(2) with intent to destroy or damage any building or habitation to collect insurance for the damage or destruction.

1973 Tex.Gen.Laws 924. Suppose the State's evidence showed that the defendant had intentionally killed the victim by burning the victim's home. Moreover, suppose that before igniting the fire, the defendant had bound the victim so securely that no possibility existed that the victim would escape the burning building. According to appellant's interpretation, the State could not pursue a capital murder prosecution because the State could never prove conduct to satisfy the requirements of murder, separate from the conduct which constituted the offense of arson. Under this interpretation of the statute, the State could pursue a capital murder prosecution only if it could prove the murder occurred totally independent from the arson. We cannot believe that the Legislature intended to insulate from a capital murder prosecution a defendant who had committed arson and murder in the above-described manner.

Interpreting the statute thusly yields absurd results in situations where a capital murder is combined with aggravated rape, robbery, and arson. Therefore, we reject appellant's interpretation of Tex.Penal Code § 19.03(a)(2). Instead, we adopt an interpretation of the statute that allows the State to seek a capital murder conviction in cases similar to those we have already elaborated upon. The fact that appellant's murder and aggravated rape of J__ B__ occurred contemporaneously does not preclude a prosecution under the capital murder statute.

 In cases where the State can show that an aggravated rape and a murder were committed by the same person within a short time period, a capital murder prosecution will not be barred because of the mere fact that the two offenses occurred in such a manner that proof of two totally separate crimes is impossible. We conclude that in such situations, the elements of the aggravated rape and the murder may overlap. Since the elements may overlap, the conduct which serves as an element of the murder may also serve as an element of the aggravated rape.

This interpretation of the statute is in accord with the decisions of this court is-

**246**

sued in two analogous cases. In *Barnard v. State*, 730 S.W.2d 703 (Tex.Cr.App.1987), a convenience store clerk was shot in the face during a robbery. The State used the shooting as an element of both the robbery and the capital murder. Writing for this Court, Presiding Judge McCormick noted that the pecuniary motive behind a robbery-murder renders the crime an atrocity worthy of the death penalty. *Id.* at 709. Moreover, in light of this legislative purpose, it became irrelevant that the robbery and the murder might have had a shared element. *Id.*, quoting *Randle v. State*, 697 S.W.2d 13, 16–17 (Tex.App.—Houston [14th Dist.] 1985, no pet.).

The actual or threatened violence of the aggravated rape, which forces a person to submit to the most intimate kind of physical contact possible, in combination with the murder of the person renders the act worthy of the law's ultimate sanction. In light of this rationale, it is immaterial which one of the nine blows to J__ B__'s head, or which combination thereof, served as the aggravating factor in her rape and which one or ones ultimately caused her death.

More support for this position is found in *Wooldridge v. State*, 653 S.W.2d 811 (Tex. Cr.App.1983), a case with facts similar to the instant case. In *Wooldridge*, we could discern no material difference between the rapist who killed his victim after completing the rape and the fleeing bank robber who shot his victim in an effort to dispose of the only witness to his crime. *Id.* at 816. Likewise, we discern no substantive difference between the fleeing robber described above and a rapist who commits murder in such a way that the best scientific evidence can state with confidence only that a rape and murder occurred close in time, but which cannot distinguish which conduct aggravated the rape and which conduct solely caused the victim's death. "[W]e believe that this is the very conduct the Legislature sought to proscribe as a capital offense in § 19.03(a)(2), ..." *Id.* Accordingly, we conclude that the facts in appellant's case constituted a proper subject for prosecution under the capital murder statute.

Having so concluded, we now address appellant's sufficiency challenge. In assessing the sufficiency of the evidence, we must consider all of the evidence in the record in the light most favorable to the jury's verdict, and decide whether any reasonable jury could have found from that evidence every element of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Geesa v. State*, 820 S.W.2d 154, 158–159 (Tex.Cr. App.1991). In conducting this review, we do not reevaluate the weight and credibility of the evidence, but act only to ensure that the jury reached a rational decision. *Moreno v. State*, 755 S.W.2d 866, 867 (Tex.Cr. App.1988).

Appellant was charged with, and found guilty of, violating Tex.Penal Code § 19.03(a)(2). The State presented eighteen witnesses during the trial's guilt/innocence phase in an attempt to prove appellant's guilt. Appellant presented four witnesses. Viewed in the light most favorable to the jury's verdict, the testimony adduced at trial established the following:

On Monday morning, December 20, 1976, Georgetown resident Andrea Garcia, a friend of J__ B__'s, returned J__ B__ to J__ B__'s dormitory on the campus of Southwestern University. According to Garcia, J__ B__ was planning to board a bus at five or six o'clock in the evening to travel to Austin to visit her relatives for Christmas. In the dormitory, Randy Burt, J__ B__'s roommate, talked with J__ B__ about her plans for the holidays. Around 6:15 p.m. that evening, Professor Jack Harris saw J__ B__ on the university campus. Later that evening, J__ B__ disappeared and was reported missing.

At approximately 11:00 p.m. that evening, Georgetown resident George Hurtado responded to a radio announcement which sought any information concerning J__ B__'s disappearance. Hurtado told the Georgetown police that while driving his car near the end of the San Gabriel River bridge at 7:00 p.m. that evening, he saw a young red-haired woman walking in front of appellant on the bridge's sidewalk. Ap-

pellant was walking faster than the young lady, shortening the distance between himself and her.

Hurtado noticed appellant because appellant was wearing only a white undershirt and jeans in freezing weather. The street lamps on the bridge and the headlights of Hurtado's car provided sufficient light for him to identify appellant. Hurtado knew appellant's surname and had seen him around Georgetown on numerous occasions. Hurtado also noticed that the young lady was wearing some kind of heavy, wrap-around coat and carrying a handbag.

A second witness, Mike Maldonado, also saw appellant in the same general area later that same evening. At about 8:30 p.m., Maldonado had driven by his son's home where he saw appellant walking through the yard. Maldonado circled two blocks and returned to his son's house, where he again saw appellant. Maldonado recognized appellant's face when he saw it illuminated in his automobile's headlights because appellant had once approached him about buying a car. Like Hurtado, Maldonado also noticed that appellant was wearing only a white undershirt in extremely cold weather. Unlike Hurtado, however, Maldonado noticed that appellant's undershirt was dirty.

Another witness also saw appellant around 8:30 p.m. on December 20, 1976. Herbert Jackson, a friend of appellant's, encountered him at Monroe's Cafe, which is in the general vicinity where the crime occurred. Appellant approached Jackson, who was talking with two other friends. Jackson noticed that appellant had a cut on his forehead, a knot on his wrist, and blood on his undershirt and forehead. Additionally, the lower portions of appellant's pants legs were wet.

According to Jackson, appellant claimed that two men had accosted him and that he had escaped by running through the river. Jackson drove appellant to the home of appellant's sister and then drove back to Monroe's Cafe without appellant. A short time later, appellant returned to Monroe's Cafe and asked Jackson whether anyone had been by looking for appellant. After Jackson informed appellant that no one had made any such inquiry, appellant told Jackson that if anyone did inquire about appellant's whereabouts, Jackson should say that he had not seen appellant.

On December 21, 1976, Steve Williams found a Bible, poncho, shoes, greeting card, and purse near the northern end of the San Gabriel River bridge. Williams also found a deposit slip with J__ B__'s name on it and called the police. Williams noted that he believed that a struggle had occurred at the area where he found the objects because of the broken section of the nearby hedge and the presence of the objects.

Georgetown police officer Robert Hernandez investigated the area where Williams discovered the objects. After searching the area of the river unsuccessfully, Hernandez resumed his search on December 22, 1976, with another officer and bloodhounds. Eventually the officers searched an abandoned swimming pool and bathhouse located near the area of the bridge.

Within the bathhouse, Hernandez found the dirt on the floor disturbed, as if something had been dragged across the floor. Outside the bathhouse, Hernandez found more marks which indicated that something had been dragged over the ground. By following the trail of those marks, Hernandez and Officer Jessie Labit found blood, and finally found J__ B__'s naked body, buried underneath a pile of driftwood. Additionally, Hernandez found pieces of panty hose and a blue belt. At trial, that piece of belt was shown to match a piece of belt found by the police in the area where Maldonado had seen appellant.

Late on the evening of December 23, 1976, highway patrolman Victor Mahagan went to Jarrell to conduct surveillance of the home of appellant's brother. In response to a radio communication from the Georgetown police, Mahagan stopped a car that had been to the home of appellant's brother. In that car, Mahagan found appellant's brother Paul Muniz and appellant's sister-in-law. Mahagan followed Muniz home and entered Muniz's house with Muniz's permission. Muniz said that

if appellant were present, he would turn his brother over to Mahagan.

Inside Muniz's home, appellant's wife was sitting on a sofa. In response to a question about appellant, appellant's wife nodded toward the door to another room. Muniz entered that room, went immediately to a closet, and motioned for appellant to come out. Mahagan handcuffed appellant and took him to the patrol car. By radio transmission, Mahagan informed the Georgetown police that appellant was in custody. The police told Mahagan that an arrest warrant had been issued for appellant, so Mahagan informed appellant of his *Miranda*[9] rights.

Mahagan delivered appellant to Wallace Spillar, an officer with the Department of Public Safety (DPS). Spillar took appellant before Magistrate Bill Hill, who arraigned appellant and informed him of his rights. Spillar watched appellant sign a document stating that Magistrate Hill had informed appellant of his rights. After Spillar himself read appellant his *Miranda* rights, appellant signed a document granting his consent for the police to conduct a search. Appellant accompanied the police back to Jarrell where he retrieved an undershirt and pair of jeans.

After returning from Jarrell, the police placed appellant in the Williamson County Jail. At some point during the early morning hours of December 23, 1976, police officer William Shirley fingerprinted appellant. In addition to taking appellant's "mug shot," Shirley took some photographs of appellant's body, because appellant "had quite a few scratches, marks, [and] bruises on him at the time, [including] swollen knuckles and scratches over his cheek and eye, ..." At 11:00 a.m. on December 23, Shirley retrieved appellant from the jail and took him to the police station for interrogation. Police Chief Travis Thomas spoke with appellant for approximately an hour, during which time he again informed appellant of his rights. Thomas stated that appellant indicated he

understood his rights, but made no effort to exercise them.

Sometime around noon, Shirley again informed appellant of his rights and then proceeded to question him. During the course of the interrogation, appellant wrote out an incriminating statement. The statement, written on forms which contained the *Miranda* warnings, read as follows:

I first seen this girl Monday night walking by the bridge. Me and my brother and cousin were at my Uncle Alvin Cruz house by the jailhouse. I got off and followed her toward the Sonic Drive inn. I remember her wearing big dark coat and carrying a small purse.

I grab her and told to come with me. She said where. I said don't worry about that. Then she said o.k.

We walked across the river and went up on side of the hill. I stretched the fence. She went arcoss. I then cross. So went to the shed and we had intercourse.

I can't really remember but the way it must have been was that I knock her uncoious and drag her body down by the fence next to the fence and then throw some logs on her and then I left.

I left the body, went back arcoss the dam, went up to the ridge and I seen Herbert Jackson, Larry Drake, Gilbert Gonzales, and I asked them to give a ride home. I told them I had a fight and I needed a ride to Jarrell and would pay for gas. and then they took straight home. My wife asked me what happened. I told her I had a fight. Then I change clothes. Then I put my pants under the sink in the bathroom. I had put my shirt in my bedroom on my little girl bed. Then I change my clothes then told my sister-in-law to take me to Georgetown so they would think had a fight. We road around for a while then I told her to take me back home. my wife was with us when we road around. and

---

**9.** In this opinion, *Miranda* refers to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

we saw my friends who gave me a ride home.[10]

After obtaining this statement, the police continued to search the area around the bridge. On December 24, 1976, the police retrieved a sweater, slip, brassiere, and pair of women's underpants from the river. At trial, Garcia identified these garments which J__ B__ had been wearing on December 20, 1976. J__ B__'s mother also identified the poncho, Bible, shoes, and purse as J__ B__'s property.

At trial, the State also introduced the testimony of a DPS chemist/toxicologist, Charles Smith, and Dr. Joseph Jachimczyk, who performed an autopsy on J__ B__'s body. Smith analyzed appellant's undershirt and jeans, appellant's and J__ B__'s blood types, and numerous articles from the crime scene. Smith stated that appellant's undershirt and jeans contained traces of blood. While Smith could not determine the type of blood on the jeans, the traces on the undershirt matched appellant's blood type.

Smith also analyzed cotton fibers that had been scraped from the fingernails of J__ B__'s body. While Smith could not definitively state that these fibers came from appellant's jeans, he did say that they could have come from those jeans. Smith also analyzed strands of J__ B__'s hair and hair found on the fragment of the blue belt. The two samples of hair had similar characteristics.

The testimony of Jachimczyk established that J__ B__ had been struck nine times in the head. J__ B__'s hands exhibited "defense contusions," which the doctor described as wounds sustained while trying to cushion or avoid an oncoming blow. Jachimczyk noted that J__ B__'s brain had swollen and concluded that she died from a fractured skull sustained in association with a forced rape. Jachimczyk based his conclusion of rape upon the tearing of J__ B__'s hymen, the damage to J__ B__'s vaginal orifice, the significant blood flow from J__ B__'s vagina, and the presence of semi-

nal fluid in J__ B__'s vagina. Jachimczyk testified that the blows to J__ B__'s head had been inflicted a few moments before or after the rape.

Appellant's defensive evidence was limited to testimony that: the area at the northern end of the bridge did not appear to have been the scene of a struggle, that appellant was not hiding in a closet at his brother's house, that appellant's hand was swollen because he had broken it well before December 20, that only appellant's forehead had sustained a cut, and that positive identification of people's faces while driving across the bridge was impossible. Viewed in the light most favorable to the jury's verdict, the evidence clearly supported the jury's finding of guilt beyond a reasonable doubt. Having concluded that appellant's case was a proper subject for prosecution under the capital punishment statute and that the evidence is sufficient to sustain his conviction, we overrule appellant's first point of error.

■ Appellant contends in point of error sixteen that the evidence is insufficient to support an affirmative answer to punishment issue two concerning his future dangerousness. Again, in assessing the sufficiency of the evidence, we must view the evidence in the light most favorable to the jury's finding, and then determine whether any rational jury could have found beyond a reasonable doubt an affirmative answer to the second punishment issue. *Harris v. State,* 738 S.W.2d 207, 225–226 (Tex.Cr. App.1986).

At the punishment phase, the State introduced the testimony of five witnesses, and documentary evidence of appellant's two prior misdemeanor convictions. The testimony of C__ S__ established that appellant raped her only seven months before he raped and murdered J__ B__. Georgetown police officer Welton Watson testified that he had investigated the earlier rape and had found C__ S__ hysterical and disheveled. Magistrate Hill and Williamson County Sheriff Jim Boutwell both testified

---

**10.** All grammatical and spelling errors contained herein appear in appellant's handwritten statement.

that appellant's reputation as a peaceable, law-abiding citizen was bad. Williamson County Attorney Billy Ray Stubblefield testified that appellant was the same person who had pled guilty to resisting arrest and escape just five months prior to the rape and murder of J__ B__. Stubblefield also identified the documents bearing appellant's signature wherein he pled guilty to the two offenses.

Appellant's evidence at the punishment phase consisted of the testimony of six witnesses and a number of pictures appellant had drawn while in jail. By this evidence, appellant sought to establish that he had not been violent in the past and that he had improved himself. A number of witnesses stated that appellant had matured, had become more religious, and that he loved his children and relatives. Appellant argues that the State's evidence is insufficient because it concerns only conduct that occurred at the time of the murder, whereas his evidence pertains to his good behavior and improvement over the intervening ten years.

▆▆▆▆ The State's burden of proof on the second punishment question required the State to prove that appellant would, more likely than not, commit violent criminal acts in the future so as to constitute a continuing threat to society whether in or out of prison. *Smith v. State*, 779 S.W.2d 417, 421 (Tex.Cr.App.1989). The jury may consider the evidence presented during the trial's guilt/innocence and punishment phases in answering the second punishment question. *Valdez v. State*, 776 S.W.2d 162, 166–167 (Tex.Cr.App.1989). Moreover, the facts and circumstances of the case being prosecuted may constitute sufficient evidence of future dangerousness. *Farris v. State*, 819 S.W.2d 490, 498 (Tex.Cr.App.1990); *Muniz v. State*, 573 S.W.2d 792, 795 (Tex.Cr.App.1978).

Appellant's sixteenth point of error is without merit. Viewed in the light most favorable to the jury's affirmative answer, the evidence shows that appellant raped another woman only seven months before he raped and murdered J__ B__. Appellant had also pled guilty to two misdemeanor offenses only five months before he attacked J__ B__. Moreover, appellant's attack upon J__ B__ was brutal, as evidenced by the nine blows inflicted to her skull. On this record, we conclude that a rational jury could have found beyond a reasonable doubt that appellant constituted a continuing threat to society and overrule appellant's sixteenth point of error.

In points of error ten and eleven, appellant argues that his confession should have been suppressed because it was the product of an illegal arrest. In his tenth point of error, appellant contends that the admission of his confession violated the Fourth Amendment to the United States Constitution and Article 1, § 9 of the Texas Constitution because there was no probable cause to arrest him. In his eleventh point of error, appellant contends that in addition to violating the United States and Texas constitutions, his confession was excludable under Article 38.23, "in that there was no showing that appellant was about to escape as required by" Article 14.04.

The thrust of appellant's arguments under his tenth and eleventh points of error is that the police had no probable cause to arrest him. He contends that he was not "about to escape" as that term is found in Article 14.04. We will, however, address appellant's points by analyzing them in light of Article 14.03(a)(1), which states:

(a) Any peace officer may arrest, without warrant:

(1) persons found in suspicious places and under circumstances which reasonably show that such persons have been guilty of some felony or breach of the peace, or threaten, or are about to commit some offense against the laws; ...

We interpret this statute as "the functional equivalent of probable cause." *Johnson v. State*, 722 S.W.2d 417, 421 (Tex.Cr.App. 1986), overruled on other grounds, *McKenna v. State*, 780 S.W.2d 797, 800 (Tex.Cr. App.1989). Therefore, if appellant's arrest meets the requirements of 14.03(a)(1), we can dispose of appellant's contentions concerning a lack of probable cause and need not reach the issue of whether sufficient

grounds existed to support the belief that appellant was a threat to escape.

■ Probable cause exists "when the facts and circumstances within an officer's personal knowledge and of which he has reasonably trustworthy information are sufficient to warrant a person of reasonable caution in the belief that, more likely than not," a particular suspect has committed the crime. *Castillo v. State*, 818 S.W.2d 803, 805 n. 4 (Tex.Cr.App.1991). In determining whether probable cause existed for the arrest, we examine the cumulative information known to all the officers who cooperated in the arrest. *Woodward v. State*, 668 S.W.2d 337, 344 (Tex.Cr.App. 1982).

■ Before Mahagan arrested appellant, the authorities had substantial information implicating appellant as the perpetrator of the crime. The police had already found the body of J___ B___ and had known that she had been missing as of Monday, December 20. The police knew that Hurtado had seen a young lady fitting J___ B___'s description walking at about 7:00 p.m. toward the northern end of the San Gabriel River bridge, being followed by appellant, who was wearing only an undershirt and jeans in freezing weather. The police had already found numerous objects, including a deposit slip with J___ B___'s name on it near the northern end of the bridge. The police had reason to believe that a struggle had occurred at that end of the bridge because of the scattered objects and the broken limbs of the nearby hedge.

The police also knew that Maldonado had driven past his son's home around 8:30 p.m. on December 20 and observed appellant crossing the yard. This happened near the San Gabriel River bridge, and appellant was still dressed in only an undershirt and jeans in spite of the weather conditions. Finally, the police knew that appellant was out on bond for a rape he had committed only seven months earlier.

We next consider whether appellant was found in a suspicious place. Rarely is any place suspicious per se. *Johnson*, 722 S.W.2d at 421. Additional facts and reasonable inferences therefrom, however, may justifiably render a place suspicious from a police officer's perspective. *Id.* In this case, Mahagan knew before he approached appellant's brother that appellant was the prime suspect in the murder of J___ B___. Appellant's brother told Mahagan that if appellant were in the house, he would be turned over to Mahagan.

At the house, though, after appellant's wife nodded toward the bedroom, appellant's brother went directly to the closet in that room, opened the closet door, and motioned for appellant to come out. Mahagan testified that appellant was hiding in the closet, a reasonable inference on these facts. Based on this record, we conclude that appellant was arrested upon probable cause in a suspicious place, under circumstances that reasonably show he had committed some felony. We overrule appellant's tenth and eleventh points of error.

In points of error seven and eight, appellant argues that the admission in evidence of his confession violated his right against self incrimination as contained in the Fifth Amendment to the United States Constitution and Article 1, § 10 of the Texas Constitution. The basis of appellant's complaint in point of error seven is that the police ignored his repeated requests for an attorney. In point of error eight, appellant argues that his confession was involuntary on the basis of threats and promises made by the police.

■ Before addressing the substance of appellant's seventh and eighth points of error, we conclude that we need not address appellant's Texas constitutional claims. Appellant has proffered no argument or authority concerning the protection provided by the Texas Constitution or how that protection differs from the protection provided by the United States Constitution. State and federal constitutional claims should be argued in separate grounds, with separate substantive analysis or argument provided for each ground. *Heitman v. State*, 815 S.W.2d 681, 690–691 n. 23 (Tex.Cr.App.1991); *Morehead v. State*, 807 S.W.2d 577, 579 n. 1 (Tex.Cr. App.1991); Tex.R.App.Proc. 74 and 210.

We will not make appellant's state constitutional arguments for him.

Concerning the seventh point of error, appellant emphasizes that the record shows that, during custodial interrogation, he requested an attorney at least two different times. Appellant admits that the testimony shows that in response to one of his requests for an attorney, Officer Shirley began to dial the telephone number of an attorney, but stopped when, according to Shirley, appellant told him "No, I will talk to him later." Even though the trial judge dictated into the record findings of fact which found that appellant had voluntarily confessed and waived his right to counsel, appellant argues in his brief that the admission constituted error because "the State was obliged to address each instance in which Appellant invoked his right to counsel."

As shown by this quotation from the brief, the thrust of appellant's argument is that the State failed to directly rebut appellant's testimony that he repeatedly asked for an attorney. In support of his position, appellant directs our attention to a portion of Shirley's testimony from the original trial in 1977.[11] In response to a question inquiring whether appellant had asked to speak with an attorney, Shirley stated, "At a couple of periods of time, yes, there were a couple of times he asked to talk to an attorney, yes." On the basis of the State's failure to rebut his claim of repeated requests for counsel, appellant argues that his confession should have been suppressed because the State failed to prove that it was given voluntarily.

■■■■ At a hearing to determine the voluntariness of a confession, the State need not rebut appellant's assertions, but only controvert them. *Dunn v. State,* 721 S.W.2d 325, 333 (Tex.Cr.App.1986). When the case presents a controverted issue to the trial court, the trial court acts exclusively as the factfinder, assessing the credibility of the witnesses and the weight to be accorded their testimony. *Gentry v. State,*

770 S.W.2d 780, 790 (Tex.Cr.App.1988). If the trial court's resolution of a controverted issue is supported by the record, a reviewing court should not disturb the trial court's decision. *Dunn,* 721 S.W.2d at 336.

■■■■ The State's evidence contradicted appellant's assertions. While Shirley did state in 1977 that appellant asked to talk to an attorney "a couple of times," he also stated in 1977 that appellant had requested an attorney only "at one period." Shirley added that he told appellant that he could have an attorney present even after appellant had said "No, I will talk to him later." Still, appellant did not seek to exercise his right to counsel. Shirley also stated at both trials that the police did not deny appellant any of his rights, including his right to an attorney. All the other peace officers who testified stated that appellant was not denied his right to an attorney because appellant never invoked that right in their presence. Whether appellant repeatedly requested an attorney was a question for the trial judge. On this record, we conclude that the trial judge, acting as the factfinder, decided a controverted question in a manner supported by the record. We must, however, analyze whether appellant's single request for an attorney renders his confession inadmissible.

In *Minnick v. Mississippi,* 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990), the Supreme Court reiterated its holding from *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), that once the accused invoked his right to counsel, interrogation had to cease until counsel had been made available to the accused, unless the accused himself initiated any further communication. *Minnick,* 498 U.S. at 151–52, 111 S.Ct. at 490. This rule seeks to ensure "that any statement made in a subsequent interrogation is not the result of coercive pressures." *Id.* at 149–50, 111 S.Ct. at 489. *Minnick,* however, failed to alter the rule that an accused may still waive the Fifth Amendment right to coun-

---

**11.** The same judge presided over both trials. At the second trial, the judge took judicial notice of all of the former testimony and proceedings.

sel even after having already invoked it. *Id.* at 154–56, 111 S.Ct. at 492.

To establish a waiver, the State must demonstrate that the accused intentionally relinquished a right of which he was aware. *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). Whether a waiver is shown "must depend, in each case, upon the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." *Id.* If the State's evidence shows nothing more than that the accused responded to further police-initiated custodial interrogation, a valid waiver is not shown. *Smith v. Illinois,* 469 U.S. 91, 98, 105 S.Ct. 490, 494, 83 L.Ed.2d 488 (1984).

In *Smith,* the Supreme Court held that the State may not rely upon an accused's subsequent responses to police interrogation in order to cast doubt upon the adequacy of the accused's initial request for counsel. *Id.* at 100, 105 S.Ct. at 495. The Court expressly refused to decide, however, "the circumstances in which an accused's request for counsel may be characterized as ambiguous or equivocal as a result of events preceding the request or of nuances inherent in the request itself, nor . . . the consequences of such ambiguity." *Id.*

This case presents a prime example of a direct request for counsel that was rendered at least ambiguous by appellant's subsequent statement that he would talk to the attorney later. From the record before the trial judge, it appears that appellant did request an attorney, but withdrew his request as Shirley was dialing the phone number to contact that attorney. Appellant's withdrawal of his request was not the product of further interrogation, but a voluntary act on appellant's part. See *Granviel v. Lynaugh,* 881 F.2d 185 (5th Cir.1990), cert. denied, 495 U.S. 963, 110 S.Ct. 2577, 109 L.Ed.2d 758 (1990). The record reveals that appellant had dealt with the police only months before the incident involved here and was well aware of his right to consult with counsel. The police respected appellant's wishes, and appellant's statements after he withdrew his request for counsel were not the product of coercive pressures. After applying the test set out in *Johnson v. Zerbst,* supra, we conclude that appellant knowingly relinquished his right to consult with an attorney. Having concluded that appellant's confession was admissible because he had waived his right to have an attorney present, we overrule appellant's seventh point of error.

Concerning appellant's eighth point of error, in which he claims that his confession was the result of threats and/or promises, appellant testified that no peace officer read him his rights and that all of the officers involved ignored his repeated requests for an attorney. Appellant stated that Shirley cursed him, hit him with a drinking glass, threatened to shoot him, told him what to write in his confession, and promised him leniency if he would confess. Appellant also alleges that Shirley promised to help appellant's pregnant wife and sick mother.

The State's evidence contradicted appellant's testimony in many respects. As noted, each officer who interrogated appellant testified that he informed appellant of his rights before commencing any interrogation. Shirley stated that he never cursed, threatened, or struck appellant. Shirley admitted offering to contact charitable agencies or the proper authorities who might be able to give assistance to appellant's mother and wife.

Shirley also admitted discussing with appellant a case where a murderer confessed and received a term in a mental institution. Relative to this subject, Shirley testified that he told appellant "that in some cases leniency is shown if people, if suspects give a statement, yes, sometimes there are leniencies." Shirley denied that he told appellant what to write or that he promised appellant leniency in return for a confession.

Before addressing the substance of appellant's arguments concerning promises allegedly made by the police, we note that the State controverted all of appellant's allegations that he had been threatened or

coerced. Therefore, the trial court, as the exclusive judge of witness credibility, acted well within its authority in disbelieving appellant's assertions. *Gentry*, 770 S.W.2d at 790. The issue of promises as an inducement for the confession, however, requires further analysis.

■ Before a promise will render a confession inadmissible, it must be shown that the promise induced the confession. *Jacobs v. State*, 787 S.W.2d 397, 399 (Tex.Cr. App.1990). In order to induce the confession, the promise must be (1) positive, (2) made or sanctioned by someone in authority, and (3) of such an influential nature that a defendant would speak untruthfully in response thereto. *Id.*

■ Concerning the discussion about leniency, the record shows that Shirley stated that leniency was sometimes shown when a defendant confessed. This was simply a statement of fact. Appellant has failed to demonstrate that the party in authority positively and unequivocally promised leniency in return for a confession. The conversation about leniency fails to rise to the level of a promise.

■ Regarding the discussion of providing aid to appellant's family, Shirley did promise to contact the proper charitable authorities. Also, Shirley, as a peace officer, constitutes a person in a position of authority. Appellant's argument fails, however, on the third requirement listed above. We fail to see how a promise to contact the proper charitable authorities could influence a person to untruthfully confess to the heinous crime involved here. Since anyone, even appellant's own family, could have contacted those authorities, we cannot conclude that Shirley's offer induced appellant's confession. We overrule appellant's eighth point of error.

In his eighteenth point of error, appellant complains of the systematic exclusion of Mexican–Americans from the grand jury that indicted him. In our original opinion, this Court concluded that appellant had failed to preserve any error concerning the array of the grand jury. *Muniz*, 573 S.W.2d at 796. In accord with the "law of the case" doctrine, we refuse to depart from our original disposition of this point of error. See *Jordan v. State*, 576 S.W.2d 825, 827–828 (Tex.Cr.App.1978). We overrule appellant's eighteenth point of error.

In his ninth point of error, appellant contends that the trial court erred in refusing to submit to the jury a question about whether he had confessed voluntarily or only as the result of coercion and/or promises. Appellant did not testify before the jury. Appellant did cross-examine the State's witnesses concerning his arrest and interrogation. Appellant argues that the evidence before the jury showed that he had been arrested late at night, had gotten little sleep, had been ignored when he requested an attorney, had been denied food, and had been exposed to the State's theory of the case, including photographs of J— B—'s body.

■ When evidence from any source raises a defensive issue, and the defendant properly requests a jury charge on that issue, the trial court must submit the issue to the jury. *Moore v. State*, 574 S.W.2d 122, 124 (Tex.Cr.App.1978). The evidence which raises the issue may be either strong, weak, contradicted, unimpeached, or unbelievable. *Sanders v. State*, 707 S.W.2d 78, 80 (Tex.Cr.App.1986), limited on other grounds, *Willis v. State*, 790 S.W.2d 307, 314 (Tex.Cr.App.1990). When the evidence fails, however, to raise a defensive issue, the trial court commits no error in refusing a requested instruction. *Kunkle v. State*, 771 S.W.2d 435, 444 (Tex.Cr.App. 1986).

■ In *Hughes v. State*, 562 S.W.2d 857, 863 (Tex.Cr.App.1978), which also involved a trial court's refusal to charge the jury on the voluntariness of appellant's confession, this Court wrote "Appellant did not testify before the jury and did not call any witnesses on the issue of voluntariness. There was no evidence before the jury which raised that issue. Thus, the court did not err in refusing the charge."

Likewise in this case, appellant did not testify or call any witnesses on the issue of voluntariness. The vast majority of appel-

lant's "evidence" consisted of leading questions propounded to peace officers, questions which implied that appellant was coerced into confessing. Each witness answered these questions in the negative, expressly refuting the implication of coercion.

Appellant's only affirmative evidence on these issues concerned the facts that he was arrested late at night, did not eat until after he confessed, and had been exposed to the State's theory of the case, including pictures of J__ B__'s body. The witnesses, however, disputed appellant's assertions that he was denied food, denied an attorney, or denied sleep. On this record, we conclude that no evidence before the jury raised the issue of the voluntariness of appellant's confession.[12] Therefore, the trial court committed no error in refusing appellant's requested instruction. We overrule appellant's ninth point of error.

■ Appellant's second through sixth points of error are interrelated. In his second point of error, appellant complains of the trial court's refusal to instruct the jury about the differing definitions of the terms "deliberately" and "intentionally," which are contained in the first punishment issue. While acknowledging that the trial court is not normally required to define "deliberately," See *Morin v. State*, 682 S.W.2d 265, 270 (Tex.Cr.App.1983), appellant asserts that his case presents a situation different in nature from those previously addressed by this Court. Appellant claims that his trial counsel made comments which effectively informed the jury that "deliberately" and "intentionally" were synonyms.

Based on this misinformation, appellant argues in his third and sixth points of error that he was convicted in violation of the due process of law and due course of law provisions of the United States and Texas constitutions, respectively. Also, based upon this alleged confusion regarding the definition of "deliberately," appellant in his fourth and fifth points of error contends that his death sentence violates the proscriptions against cruel and unusual punishment contained in the United States and Texas constitutions.

Appellant's points of error two through six lack merit. We refuse to depart from our holding that the trial court need not define the term "deliberately." *Russell v. State*, 665 S.W.2d 771, 780 (Tex.Cr.App. 1983). Moreover, even if any error was committed, appellant presents nothing for review concerning the jury charge on punishment. Appellant's counsel requested no instruction regarding the term "deliberately" and lodged no objection to the court's punishment charge. A failure to object can waive even an error involving constitutional rights. *Id.* at 777. We overrule appellant's points or error two through six.

■ In his twelfth point of error, appellant complains of the trial court's admission in evidence, during the trial's punishment phase, of the documents pertaining to his two prior misdemeanor convictions. Appellant argues that his "prior convictions were void" because they reflect that appellant was not represented by counsel and do not indicate that appellant "knowingly and intelligently waived his right to counsel." Accordingly, appellant contends that the convictions should have been suppressed.

■ Both documents in which appellant waived his right to trial and pled guilty contain the statement "I do not wish to have a lawyer represent me at this hearing and will represent myself." Despite appellant's contentions to the contrary, his convictions are valid and his waiver of counsel is clear enough. Valid prior convictions may be admitted at the punishment phase of a capital trial. *Hawkins v. State*, 660 S.W.2d 65, 82 (Tex.Cr.App.1983). Appel-

12. This conclusion should not be construed as a requirement that an accused must testify before the jury or call any witnesses before the issue of the voluntariness of a confession will be raised by the evidence. In cases such as this, however, where the overwhelming majority of the appellant's evidence is in the form of leading questions, and the witnesses expressly deny the implications contained in the questions and directly negate any inferences of coercion, no evidence is presented which raises the issue of voluntariness such that the trial court is required to submit a jury instruction pertaining to that issue.

lant further waived any error by failing to object to their admission. *Bacon v. State*, 500 S.W.2d 512, 515 (Tex.Cr.App.1973). We overrule appellant's twelfth point of error.

In his fifteenth point of error, appellant argues that the trial court erred in failing to instruct the jury at the punishment phase "that the jury in its deliberations should consider all evidence of mitigating circumstances presented to it." At the punishment phase, appellant introduced evidence that he (1) was raised in poverty by his mother alone, (2) was religious, (3) was generous and loving to his family and relatives, (4) was a good son and had been a good sibling, (5) had been involved in church activities in his youth, and (6) had developed his artistic abilities. Appellant claims that the "relevance of this evidence went beyond the scope of the second special issue [and that jurors] who thought that someone with [these] character qualities ... was less morally culpable than someone without ... simply did not have a way of expressing that distinction under the two special issues submitted in this case." In support of this position, appellant directs our attention to the case of *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

■■■ As we have interpreted *Penry*, a capital sentencing scheme offends no federal constitutional provisions if the scheme both allows the jury to consider relevant mitigating evidence and provides the jury some means of expressing a reasoned moral response to that evidence in making an individualized assessment of punishment. *Goss v. State*, 826 S.W.2d 162, 165 (Tex.Cr. App.1992). In analyzing a *Penry*-type claim, we look to see if the evidence presented at trial is specifically relevant to a defendant's "moral culpability," i.e. whether the evidence provides a basis for concluding that the defendant is less deserving of capital punishment. *Id.* at 165. If the relationship between the particular case's evidence and the special issues is such that the special issues provide no means for the jurors to respond in a morally reasoned way, the statute is unconstitutional as ap-

plied. *Id.* From this, a defendant is entitled to an additional instruction only if the evidence is relevant to the case in a manner that is beyond the scope of the special issues. *Id.*

■■■ The capital punishment statute is not unconstitutional as applied to appellant's case. Except for the evidence pertaining to appellant's development of his artistic faculties, all of appellant's evidence fell within the ambit of the second special issue. The evidence that appellant had been a good family man, had treated his mother and siblings well, had taken part in church activities as a youth, had been raised in poverty, and had not been violent, all pertain to appellant's character and propensity for constituting a future danger to society. *Goss*, 826 S.W.2d at 166; *Earhart v. State*, 823 S.W.2d 607, 632 (Tex.Cr.App. 1991); *Ex Parte Baldree*, 810 S.W.2d 213, 217 (Tex.Cr.App.1991).

Concerning appellant's artistic abilities, we conclude that in this case the evidence adduced "is otherwise irrelevant to an individualized assessment of the deathworthiness of appellant." *Lackey v. State*, 819 S.W.2d 111, 134 (Tex.Cr.App.1989). Unlike Penry's evidence of child abuse and brain damage, appellant's evidence "does not tend to excuse or explain his criminal act, ..." *Id.* Therefore, we conclude that appellant was not entitled to an additional instruction regarding mitigating evidence. The jury's assessment of all of appellant's relevant evidence could be expressed through the second special issue. We overrule appellant's fifteenth point of error.

■■■ In his fourteenth point of error, appellant argues that the Texas capital punishment statute is unconstitutional on its face. Appellant argues that the statute fails to satisfy the requirements of *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), "because its second special issue 1) restricts the jury's role to that of a factfinder rather than as a body whose duty it is to assess or recommend a punishment, and 2) asks the jury to make a single determination that renders much mitigating evidence irrelevant, or worse, actually turns such evidence against the defen-

dant." (Emphasis in appellant's brief.) The core contention of appellant's argument is that evidence which produces a mitigating effect by evoking sympathy can also produce an aggravating effect when viewed in the context of the second punishment issue.[13]

Appellant's argument is devoid of merit. The Texas statute failed to offend the United States Constitution in 1976. *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). The Supreme Court failed to find the statute facially unconstitutional in 1988. *Franklin v. Lynaugh,* 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988). Moreover, in 1989, the statute was found to offend the Constitution only as it applied to a particular petitioner. *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). The Texas statute suffers from no facial invalidity. We overrule appellant's fourteenth point of error.

In his seventeenth point of error, appellant contends that his prosecution under the capital punishment statute in the instant case violated the double jeopardy clauses of both the United States and Texas constitutions. The substantive argument underlying this point of error was advanced and disposed of in our original opinion.[14] *Muniz,* 573 S.W.2d at 794. In accord with the "law of the case" doctrine, we adhere to our original disposition of this point of error. See *Jordan,* 576 S.W.2d at 827–828. We therefore overrule appellant's seventeenth point of error.

In his thirteenth point of error, appellant claims that he received ineffective assistance of counsel in violation of the Sixth Amendment to the United States Constitution and article 1, § 10 of the Texas Constitution. Appellant directs our attention to numerous instances where his counsel performed deficiently. Appellant first complains that during the individual voir dire, his trial counsel misinformed three jurors

of the definition of "deliberately," effectively conveying the false impression that "deliberately" and "intentionally" were synonyms. Appellant claims that the effect of this misinformation was "to wholly nullify issue one as a consideration for the jury at the punishment phase of the trial."

Appellant also complains of his attorney's failure to challenge peremptorily three members of the venire who allegedly exhibited a clear bias in favor of the State. Appellant complains that venirepersons Berry Sullivan, Donna Rhode, and Mary Harbin should have been the subject of his attorney's three remaining peremptory challenges. Appellant bases his complaint against Sullivan upon Sullivan's comment to the effect that he would have to be fifty-one percent certain or more before he could return affirmative answers to the punishment issues. Appellant bases his complaint against Rhode upon her statement that she would be biased against someone charged with the combination of rape and capital murder, as opposed to someone charged with the combination of robbery and capital murder. Appellant bases his complaint against Harbin upon her knowledge of appellant's past conviction for the instant offense and her two statements, one to the effect that she could not definitely state that her knowledge would have absolutely no effect upon her and one to the effect that prison inmates obtained parole too easily.

As further grounds for his claim of ineffective assistance, appellant complains of his counsel's interrogation of a witness at the trial's punishment phase which "opened the door for the State to introduce otherwise inadmissible evidence that Appellant had been on death row since his first trial." The record reflects that appellant's counsel asked Sheriff Boutwell if he had had any problems with appellant since 1978. After Boutwell answered that he had not, the

---

**13.** As an example, appellant argues that a defendant's youth may evoke sympathy from the jury, but may also simply be taken by the jury to mean that a defendant "has more time to continue his violent criminal career."

**14.** In the former appeal of this case, appellant argued that the jury returned an answer which operated as an implied acquittal concerning capital punishment. This court rejected appellant's argument in 1978 and we find no ground for reconsidering the contention now.

prosecutor asked Boutwell where appellant had been during most of that time. Boutwell answered that appellant had been "on death row in Huntsville."

Appellant's final example of his attorney's alleged deficiency concerns the admission in evidence of appellant's two prior misdemeanor convictions. Appellant argues, as per his twelfth point of error, that the convictions were void and inadmissible, and that "an objection from counsel could have prevented their admission in evidence."

Based upon all of the aforementioned instances, appellant contends that his attorney's performance fell below the constitutionally mandated standards set out in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Appellant contends that the combination of these acts resulted in a "breakdown in the adversarial process sufficient to call into question the fundamental fairness of the proceedings."

In order to prevail upon a claim of ineffective assistance of counsel, an appellant must meet the requirements of a two-prong test. *Id.* at 687, 693, 104 S.Ct. at 2064, 2067; *Hernandez v. State,* 726 S.W.2d 53, 56–57 (Tex.Cr.App.1986). An appellant must first demonstrate that his attorney's performance "fell below an objective standard of reasonableness." *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2064. Additionally, an appellant must demonstrate "a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. In this regard, a probability is reasonable only if it is "sufficient to undermine confidence in the outcome." *Id.*

We begin our analysis of appellant's specific complaints by noting that we have already concluded in our discussion of his twelfth point of error that the trial court committed no error in admitting the evidence of appellant's two prior misdemeanor convictions. As the documents were admissible, the attorney's failure to object to them constituted no error.

The same is true of counsel's failure to exercise his peremptory challenges against venirepersons Sullivan, Rhode, and Harbin. After reviewing the entire voir dire of these individuals, we cannot agree with appellant's assertion that they "clearly were biased in favor of the State."

 Sullivan did say that he would have to be fifty-one percent certain or more before he could return affirmative answers to the punishment issues. We interpret this statement to be his internal conception of what "beyond a reasonable doubt" would mean. Sullivan agreed with the prosecutor's comment at voir dire that the State's burden was "more than just a tipping of the scale." Sullivan stated that he would hold the State to its burden of proof, that he would have to have no reservations about his decision, and that he based his decisions upon his own independent analysis of the facts presented.

 Venireperson Rhode did state that she would have an immediate, tremendous prejudice against someone charged with rape and capital murder, as opposed to someone charged with robbery and capital murder. She also stated, however, that she would not apply this prejudice to appellant. When asked if she could give appellant the presumption of innocence, she answered "certainly." She also indicated that she agreed with the legal propositions that the State had the burden of proof, that appellant need not present any evidence, and that he had no duty to testify. Concerning this final proposition, Rhode stated that she would not hold it against appellant if he did not testify.

 With respect to venireperson Harbin, it is true that she admitted that she had some knowledge of appellant's prior conviction and felt that parole was too easily obtainable. While she could not positively state that her knowledge of the past conviction would have absolutely no effect upon her in the instant case, she also made comments to the effect that she would be hesitant to vote in favor of the death penalty because it would be difficult on appellant's nephew, whom she knew. On the basis of this final statement alone, the State would have been warranted in the

belief that Harbin might be biased in appellant's favor.

In short, our review of the entire voir dire of each venireperson reveals no bias against appellant. Counsel's failure to challenge peremptorily these three venirepersons constitutes no basis for a claim of ineffective assistance of counsel.

We now address appellant's complaints based upon defense counsel's remarks about the definitions of "deliberately" and "intentionally." To venireperson Ronald Ballenger, counsel said that "in most cases you can sort of derive the answer from [sic] that first question from what happened in the guilt or innocence stage, ..." To venireperson Tanya Pavliska, counsel said that "if you find him guilty, it pretty much follows that it was deliberate." To venireperson Jessie South, counsel stated that the "first question normally is fairly easily answered ... because if it wasn't deliberate, you probably wouldn't have convicted him in the first place."

 Counsel's comment to Ballenger presented no error. In almost all cases, the evidence constituting deliberation will be adduced during the trial's guilt/innocence phase. As for the other two comments, we disagree with appellant's characterization of the effect of counsel's remarks: counsel's statements did not necessarily have the effect of informing the jurors that "deliberately" was a synonym for "intentionally." Counsel did, however, discount the difference between the two terms. Given the facts of this case, such a strategy does not appear to have been unreasonable.

 Finally, we address appellant's contention concerning defense counsel's question which "opened the door" for the State to elicit testimony that appellant had been on death row for approximately ten years. Appellant's counsel did "open the door" by asking a question which implied that appellant had presented no problems in the community over the course of the preceding decade. Counsel's conduct in asking the question invited the Sheriff's adverse response.

We conclude, however, that this conduct fails to require a reversal of appellant's conviction. A reversal is required only if our confidence in the outcome is undermined. *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. The State introduced considerable evidence during both phases of the trial. The jury knew that appellant had raped another woman and had pled guilty to two offenses only months before the instant offense. The jury also knew that appellant's reputation as a peaceable, law-abiding citizen was bad.

Beyond the strength of the State's case, the record also reflects that counsel performed his duty in a professional and zealous manner. Counsel vigorously cross-examined witnesses, repeatedly objected to the introduction of appellant's statement, and presented evidence at the trial's punishment phase concerning appellant's artistic abilities and past conduct. On this record, we cannot conclude that counsel's one obvious mistake which allowed the State to introduce evidence of appellant's death row incarceration negated an otherwise wholly commendable performance. Appellant was not denied effective assistance of counsel. We overrule appellant's thirteenth point of error.

The judgment of the trial court is AFFIRMED.

MEYERS, J., not participating.

CLINTON, Judge, dissenting.

Appellant was first convicted in 1977 of the offense of murder in the course of committing aggravated rape. See V.T.C.A. Penal Code, § 19.03(a)(2), as it read prior to amendment by Acts 1983, 68th Leg., ch. 977, p. 5317, § 6, eff. September 1, 1983. On direct appeal this Court affirmed his conviction. *Muniz v. State*, 573 S.W.2d 792 (Tex.Cr.App.1978). Subsequently, however, the Fifth Circuit Court of Appeals granted federal habeas corpus relief, and ordered a new trial. *Muniz v. Procunier*, 760 F.2d 588 (CA5 1985). Appellant was retried under the same indictment in 1986, was again convicted and sentenced to death, and is once again before us on direct appeal. Article 37.071(h), V.A.C.C.P.

In his first point of error appellant contends his conviction for capital murder on the facts presented "constitutes an improper use of the capital murder statute." From the evidence presented at trial, he argues, it is apparent the State was bound to rely upon the very act of killing his victim to establish the aggravating element that raises the underlying felony to the level of aggravated rape as required for conviction under § 19.03(a)(2), supra.[1] In essence, although he does not specifically pray for an acquittal, appellant thus attacks the sufficiency of the State's evidence to show capital murder in this cause.

## I.

Viewed in the light most favorable to the verdict, the evidence shows that shortly after 7:00 p.m. on the evening of December 20, 1976, appellant was seen following close behind Janis Carol Bickham, a Southwestern University co-ed, on a bridge crossing the North San Gabriel River in Georgetown. The temperature at the time was sub-freezing. At 10:00 a.m. the next morning, December 21, 1976, a surveyor found Bickham's Bible, shoes, open purse, poncho and a greeting card bearing her handwriting, apparently scattered about the ground on the other side of a trimmed hedge at the end of the bridge.[2] "[S]everal of the hedges were broken over[,]" with limbs apparently strewn about, and "the dirt was scuffed up like somebody had been tussling." The next day, December 22, 1976, the police brought in dogs. The dogs followed the scent obtained from Bickham's shoes down to the river bottom, where they

lost it. The water was, at that time, "about knee deep or a little higher." On the opposite side of the river the police found a wire fence that had recently been bent down and apparently crossed over. Up the riverbank from the fence was an abandoned swimming pool and a roofless bathhouse. Inside the bathhouse police found that "the debris had been scattered around ... like a scuffle had taken place there." It appeared to police that the scattering of debris had been a recent event.[3] There was an area within the bathhouse that looked "like somebody had been laying down[.]" There was no evidence of blood in the bathhouse, however. Drag marks in the grass and a trail of broken twigs led to where Bickham's nude body was ultimately found, about fifty feet away, in the direction of the river, under a pile of driftwood. Along the way police found pantyhose and a portion of a belt. They also found "a lot of blood" that testimony showed was at a spot about three feet in diameter and "roughly" twenty feet from the body. A diagram admitted into evidence but not appearing in our appellate record reportedly described what we take to be this same area as "blood spots in struggle, approximately 15 feet to body[.]" Also, "some drops of blood" described as "minor" were observed at a separate location near the body.[4] Investigating officers could recall observing no other blood along the evidentiary trail leading from the bathhouse to the body. After the body was removed, police found a piece of driftwood close by with a blood stain on it. The stain on the driftwood showed a pattern that

1. Prior to the 1983 amendment, § 19.03(a)(2) read:
 "(a) A person commits an offense if he commits murder as defined under Section 19.02(a)(1) of this Code and:
 * * * * * *
 (2) the person intentionally commits the murder in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated rape, or arson[.]"

2. A diagram of the area showing the location of these items was admitted into evidence, but is not included in the appellate record.

3. One officer testified, "And you could tell that the thing was freshly done because of the way

you could tell by the way it was done." He later testified that he considered the marks to be fresh because they were similar to the footprints the police themselves made on the dirty bathhouse floor. Judging solely from the xeroxed copies of photographs that were introduced into evidence showing the inside of the bathhouse, it is not apparent that a scuffle took place at all, much less a recent one.

4. Again, because the diagram is not in the appellate record, we cannot be sure of the precise location of these blood drops in relation to the body of the deceased or the spot where "a lot of blood" was found.

was subsequently found to match the pattern of Bickham's turtleneck sweater, later recovered from the riverbed. Also found in various parts of the river were Bickham's bra, panties and slip.

About 8:30 p.m. on the night of December 20, 1976, an acquaintance of appellant saw him in a bloody T-shirt,[5] apparently coming from the direction of the scene of the offense.[6] Appellant had a cut on his forehead and a knot on his right wrist. Asked what had happened, appellant told his acquaintance that he had been jumped from behind and "[t]hat they had fought down there by the bridge, and he had put his hand in—you know, put his hand in his [assailant's] mouth and it pulled his jaw loose." Appellant further opined that he may have killed his assailant. The bottoms of appellant's pants were wet, and he explained that he had run through the river. Later that night appellant reappeared and asked his acquaintance whether anyone had been looking for him. Informed that nobody had, appellant told his acquaintance to tell anyone who might inquire that he had not seen appellant that night.

When he was arrested on the night of December 23, 1976, appellant had "fresh" bruises and abrasions on his arms and upper body, and scrapes on his kneecaps. The next day appellant gave a statement to police in his own handwriting. In relevant part the statement reads:

"I first seen this girl monday night walking by the bridge me and my brother + cousin were at my uncle Alvin Cruz house by the jail house. I got off and followed her toward Sonic Drive inn.

I remember her waring big dark coat and carring a small purse.

I grab her and told to come with me she said where I said don't worry about that.

5. The blood type on the T-shirt appellant later surrendered to police was his, not the deceased's. There is some intimation that this was not, however, the shirt he wore during the offense.

6. Again, although this time there is an aerial photograph in the appellate record, the witness's allusion is utterly ambiguous on a cold record:

We walked across the river and went up on side of the hill. I stretched the fence she went across I then cross so went to the shed and we had intercoarse. * * * I knock her incocous [7] and drag her body down by the fence next to the fence and then throw some logs on her and then I left. [sic passim]"

Appellant told police that for a weapon he had used a rock, and that he had thrown the rock, along with Bickham's clothing, into the river. He also related that "he had thrown something away when he had reached the street." A witness saw appellant on a residential street near the river at about 8:30 p.m. on the night of the killing. A portion of belt matching that found at the scene of the killing, with a hair consistent with Bickham's caught on the buckle, was recovered from the street.

The autopsy revealed that Bickham suffered nine blows to the head, one of which broke her jaw. Her eyes had been blacked. Her vaginal orifice was traumatized, and semen was discovered therein. The pathologist further testified:

"A. ... The torso showed both on the front side and the back side, but more pronounced on the front side, linear or line like abrasions and surrounding contusions and bruising. We refer to them as brush-burn abrasions. They more commonly are known I would suspect as scrape marks. If a body is dragged, for example, you will see those kinds of marks on the body. Those were on the front side of the torso and the anterior right thigh and also to a lesser extent, not as pronounced on the back as they were on the front.

And then there were so-called defense type contusions or bruises over the dorsum, which is the top side of the hands, and the forearms.

"Q. ... Show the direction from which Pete Muniz came.
A. From this way, that way (indicating)."

7. This is my best guess at appellant's spelling of this word. His handwriting at this point is practically indecipherable. In reading appellant's statement to the jury, the prosecutor interpreted the word to be "unconscious." In context, that seems the most likely interpretation.

Q. Could you explain to us what a defense type wound is?

A. A defense type wound is that type of wound that is characterized as being the result of something or someone striking a part of the body where the victim would either tend to—if he or she is aware of a blow or blows, to either cushion the blow or ward it off. They can happen either way."

On one of Bickham's breasts was a "semicircular linear mark ... [t]hat is consistent with the upper part of her bra[.]" The pathologist agreed that this would "tend to indicate a bra being worn while being dragged[.]" All of the head wounds were of a type that their infliction would "tend to splatter blood," although "not necessarily" in "a shower of blood" as with arterial bleeding. As to specifically when the various wounds were inflicted, the autopsy was inconclusive. The pathologist testified on cross-examination:

"Q. Could you tell from your examination, Doctor, whether the blows that you have described to the head were struck at the time of the—of intercourse, after or before?

A. The best I could say was at or about the same time. It could have been a few minutes before. It might have been a few minutes after.

Q. Okay. So, there could have been intercourse before any of the blows were inflicted?

A. Yes, sir.

\* \* \* \* \* \*

Q. ... The—the eyes, the trauma to the eyes, in your opinion, did that come from blows to the eyes or can that result also from striking of the head somewhere else?

A. It can come under some circumstances for [sic] trauma to the blood elsewhere—I'm sorry, trauma to the head elsewhere. But in this particular instance, it's my opinion that it was from direct blows because of the distribution type and nature of the hemorrhage.

Q. And there is—is there any way that you can tell whether all of these injuries occurred at the same time?

A. The best, again, that I can say is at or about the same time. They were recent injuries, which means that within a very short interval prior to death.

Q. Very short interval prior to death?

A. Yes, sir.

Q. And you don't know with a great deal of specificity what that interval might have been?

A. I can't be more specific than say a matter of a few minutes or up to as long as 12 hours, but that would be the remote likelihood.

Q. Okay. So, I guess what I am getting at, and I don't know quite how to ask the question is, you're not saying that the black eyes occurred at one time and the striking of the head occurred at a different time or—you just can't tell?

A. That's correct."

## II.

Coupled with appellant's confession, the circumstantial evidence in this cause is more than sufficient to show appellant raped and killed Bickham. We know that appellant accosted Bickham at the end of the North San Gabriel River bridge, and that a "tussle" took place at the hedge there. Appellant evidently used some level of force or threat to take Bickham across the river, over a fence, and into the bathhouse, where another "struggle" ensued. Appellant had intercourse with Bickham and then somehow rendered her unconscious. He then dragged her at least partially clad body down toward the river, bludgeoned her there, apparently with a rock, and covered her naked body with driftwood. He threw her sweater and undergarments, along with the murder weapon, into the river.

Appellant concedes that he is susceptible to conviction for either murder or aggravated rape as those offenses were defined in 1976. He nevertheless argues that he should not have been convicted of capital murder. His argument is twofold. First he argues that, consistent with ordinary rules of statutory construction, § 19.-03(a)(2), supra, cannot be read to permit

conviction for capital murder whenever the act comprising the killing is all that is available to serve also as the aggravating factor elevating simple rape to aggravated rape. Second, he maintains that on the state of the present record the killing itself is in fact the only evidence available to aggravate the rape. I shall address these contentions in turn.

## A.

The indictment alleges appellant intentionally caused the death of Bickham and "was then and there in the course of committing and attempting to commit aggravated rape[.]" Conformably with the statutory definitions of rape and aggravated rape extant in 1976, the trial court authorized the jury to convict should it find appellant killed Bickham in the course of committing or attempting to commit aggravated rape as defined in the jury charge, *viz:*

"Our law provides that a person commits rape if he intentionally or knowingly has sexual intercourse with a female not his wife without the female's consent.

The intercourse is without the female's consent if he compels her to submit or participate by force that overcomes such earnest resistance as might reasonably be expected under the circumstances; or, if he compels her to submit or participate by any threat communicated by actions, words, or deeds, that would prevent resistance by a woman of ordinary resolution, under the same or similar circumstances, because of a reasonable fear of harm.

A person commits aggravated rape if he commits rape, as defined above, and he:

(a) causes serious bodily injury or attempts to cause death to the victim or

another in the course of the same criminal episode; or

(b) compels submission to the rape by threat of death or serious bodily injury to be imminently inflicted on anyone."

See former V.T.C.A. Penal Code, §§ 21.02 & 21.03, prior to amendment of the latter by Acts 1981, 67th Leg., ch. 96, p. 203, § 1, eff. September 1, 1981. "Serious bodily injury" was defined in the charge, consonant with V.T.C.A. Penal Code, § 1.07(34), as "bodily injury that creates a substantial risk of death *or that causes death,* serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." [8]

The question is whether the statutory language, reflected in the charge, admits of a prosecution for capital murder on facts that show no more than a simple rape followed by a murder. On its face the statute would seem to demand more, insofar as it requires an intentional murder in the course of an *aggravated* rape. An argument that a simple rape followed by a murder nevertheless constitutes capital murder can certainly be made. But it seems to me that such an argument could only proceed as follows: To commit capital murder under § 19.03(a)(2), supra, one must "commit murder as defined by Section 19.02(a)(1) of" the Penal Code, which is to say, one must have "cause[d] the death of an individual[.]" Moreover, under § 19.-03(a)(2) the killer must have "intentionally commit[ted] the murder[.]" Manifestly, one who has intentionally caused the death of another has also intentionally or knowingly caused "serious bodily injury" under § 1.07(34), supra, since "serious bodily injury" may be "bodily injury ... that causes death." In short, an intentional killing in the course of rape would also qualify, *a fortiori,* as an aggravated rape.[9] But

---

**8.** All emphasis supplied unless otherwise indicated.

**9.** This is the very argument the State made in *Alexander v. State,* 740 S.W.2d 749, at 760 (Tex. Cr.App.1987). The State also made the alternative argument in that cause that the evidence was sufficient to convict even assuming that aggravation of the rape apart from the killing itself was necessary. Without specifically em-

bracing either of the State's arguments, the Court in *Alexander* merely observed that "[t]he jury is the trier of the facts," and summarily held the evidence sufficient. Thus, notwithstanding West's headnote number 2, see 740 S.W.2d at 750, it is not at all clear that *Alexander* held that "[e]vidence of sexual intercourse and of serious bodily injury causing death was sufficient to support jury finding that murder was committed in course of committing or at-

therein lies the problem. For by this theory *every* rape followed by a murder will constitute capital murder. The word "aggravated" becomes wholly superfluous. This runs counter to the presumption, honored elsewhere in our capital murder jurisprudence, that in promulgating a statute the Legislature intends its entire enactment to be effective. *Heckert v. State,* 612 S.W.2d 549, at 552–53 (Tex.Cr.App.1981). See V.T.C.A., Government Code § 311.-021(2).

The State cites *Barnard v. State,* 730 S.W.2d 703 (Tex.Cr.App.1987), for the proposition that conviction for capital murder is appropriate even though the killing might be all that aggravates the rape. See also *Fearance v. State,* 771 S.W.2d 486 (Tex.Cr. App.1988). In *Barnard* the State alleged that the killing of the victim was the assaultive conduct which raised simple theft to the level of a robbery. Expressly relying upon *Garrett v. State,* 573 S.W.2d 543 (Tex.Cr.App.1978), Barnard argued that the State could not be permitted to use the killing both to elevate theft to robbery, under V.T.C.A. Penal Code, § 29.02(a)(1), and to supply the intentional murder. The Court held that *Garrett* does not support Barnard's argument. Garrett had been indicted and prosecuted for murder under the felony-murder provision in V.T.C.A. Penal Code, § 19.02(a)(3).[10] Under this theory of murder an intentional or knowing killing is not required; intent to commit the underlying felony offense will provide the culpable mental state necessary to convict for murder. The State alleged that Garrett had caused the death of his victim in the course of committing aggravated assault against him. Following "the vast majority of jurisdictions throughout the United States [that hold] that a felonious assault resulting in death cannot be used as the felony which permits application of the felony murder rule to the resulting homicide[,]" 573

S.W.2d at 545, the Court held that intent to commit the aggravated assault could not supply the necessary culpable mental state for murder under § 19.02(a)(3), supra. The Court found a source for this imposition of the so-called "merger doctrine" in the language of the statute itself. Because aggravated assault is a lesser included offense of voluntary manslaughter, and because voluntary manslaughter is expressly excluded under § 19.02(a)(3) as a basis for application of § 19.02(a)(3), supra, the Court held that Garrett could not be prosecuted for murder. "The legislative prohibition against resting a Sec. 19.02(a)(3) prosecution on voluntary manslaughter necessarily includes a prohibition against resting such a prosecution on offenses statutorily includable in voluntary manslaughter. To hold to the contrary would render the statute meaningless and its effect nil." 573 S.W.2d at 546.

Not surprisingly, the Court rejected *Garrett* as a foundation for relief in *Barnard.* The Court reasoned:

"V.T.C.A., Penal Code, Section 19.-03(a)(2) provides that a person commits capital murder if he commits a murder in the course of committing a robbery. V.T.C.A., Penal Code, Section 19.02(a)(1) provides that murder occurs when a person *intentionally or knowingly* causes the death of another individual. Unlike the felony murder provision, V.T.C.A., Penal Code, Section 19.02(a)(3), there is no transferred intent from a lesser to a greater offense under our capital murder statute. Rather under the capital murder statute, the commission of robbery is simply one of the circumstances which our legislature deemed to make the murder more deserving of the death penalty."[11]

---

tempting to commit aggravated rape, so as to elevate intentional murder to capital murder."

**10.** This provision reads:
"(a) A person commits an offense if he:
\* \* \* \* \* \*
(3) commits or attempts to commit a felony, other than voluntary or involuntary man-

slaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual."

**11.** Emphasis in the original.

730 S.W.2d at 709. See also *Fearance v. State*, supra, at 493. In short, *Garrett* construed § 19.02(a)(3), supra. It does not dictate our construction of § 19.03(a)(2), supra. It is simply inapposite to the question here.

Although he alludes to it by way of analogy, however, appellant does not rely on *Garrett*. Instead he relies upon ordinary principles of statutory construction, much as I do today. Another circumstance the Legislature deemed sufficient to make an intentional murder susceptible to the death penalty is the commission, not of simple rape, but of *aggravated* rape. "Every word of a statute is presumed to have been used for a purpose, and a cardinal rule of statutory construction requires that each sentence, clause, phrase and word be given effect if reasonably possible." *Morter v. State*, 551 S.W.2d 715, at 718 (Tex.Cr.App. 1977), quoting *Eddins–Walcher Butane Company v. Calvert*, 156 Tex. 587, 591, 298 S.W.2d 93, 96 (1957). See also *Polk v. State*, 676 S.W.2d 408, at 410 (Tex.Cr.App. 1984); *Childress v. State*, 784 S.W.2d 361, at 364 (Tex.Cr.App.1990). Cf. *Boykin v. State*, 818 S.W.2d 782, at 786 (Tex.Cr.App. 1991) (statutes should not be read in such a way as to render a portion "essentially superfluous."). To allow the killing itself to supply "serious bodily injury" so as to elevate rape to aggravated rape for purposes of prosecution for capital murder under § 19.03(a)(2), supra, effectively reads the word "aggravated" out of the statute.[12] It is possible, however, to interpret the requirement of "aggravated" rape in a way which gives purpose to the word. Accordingly, I would hold that in order to convict an accused for capital murder on a theory that he intentionally caused the death of the deceased in the course of committing or attempting to commit aggravated rape, the State must prove either that he caused serious bodily injury apart from the specific conduct that caused the death of the deceased, that by discrete conduct he attempted to cause the death of the deceased, or that he compelled submission to the rape by a threat of death or serious bodily injury to be imminently inflicted on anyone.[13] See former § 21.03, supra.

I therefore agree with the first step of appellant's argument that the State must prove aggravation of the rape by some conduct apart from the killing itself.[14] I

12. Even assuming that the rape victim and the murder victim are separate individuals, the word "aggravated" would nevertheless be superfluous. Under § 21.03(a)(1), supra, a rape may be aggravated where the defendant "causes serious bodily injury or attempts to cause death to the victim *or another* in the course of the same criminal episode[.]" A defendant who, in the course of committing an otherwise simple rape against one victim, intentionally causes the death of "another," has *a fortiori* committed aggravated rape of the first victim by virtue of having killed the second. Thus, every rape followed by an intentional murder, even the murder of "another," will result in a prosecution for capital murder, and the word "aggravated" still serves no purpose. Accordingly, although I agree with the ultimate disposition in *Crawford v. State*, 632 S.W.2d 800 (Tex.App.—Houston [14th] 1982, pet. ref'd), I cannot endorse its rationale.

· 13. Because it is necessary that the threat *compel* submission to the rape, see former § 21.03(a)(2), supra, any theory of prosecution proceeding upon a threat of death or serious bodily injury must show a threat occurring before or contemporaneous with the rape. See *Rucker v. State*, 599 S.W.2d 581, at 582 (Tex.Cr.App.1979) (panel opinion on original submission); *Church

*v. State*, 552 S.W.2d 138, at 140 (Tex.Cr.App. 1977). Unless we are to hold that a dead body can be raped, see *Gribble v. State*, 808 S.W.2d 65, at 72, n. 16 (Tex.Cr.App.1990), it must also, perforce, precede the killing.

14. The majority contends that this construction of the statute must be rejected because it leads to "absurd results." As I understand the argument, because of difficulties of proof, the State will obtain fewer convictions for capital murder, and will have to settle in many instances for separate convictions for the offenses of rape and murder. Op. at 244–245. That a particular construction may yield fewer convictions, however, hardly seems a basis to conclude it is absurd. Indeed, to give our capital murder statute its strictest interpretation would seem to be in keeping with the Eighth Amendment requirement that states narrowly circumscribe the class of death-eligible defendants. E.g., *McCleskey v. Kemp*, 481 U.S. 279, at 305, 107 S.Ct. 1756, at 1774, 95 L.Ed.2d 262, at 287 (1987). That a majority finds the narrow construction distasteful does not, except by fiat, make it absurd.

Moreover, the majority cites *Barnard v. State*, supra, and *Wooldridge v. State*, 653 S.W.2d 811 (Tex.Cr.App.1983), as authority for its construction of the statute. But the argument made in

turn to the second step of his argument and address whether the evidence here failed to establish any such conduct.

### B.

It is almost too elemental to reiterate that serious bodily injury "must be proven by evidence in order to substantiate and support a verdict." *Williams v. State*, 696 S.W.2d 896, at 898 (Tex.Cr.App.1985). Any evidence of aggravation of the rape apart from the killing itself is wholly circumstantial here. Thus, the evidence must be such as to discount every reasonable alternative hypothesis but that by an act discrete from the killing itself appellant caused serious bodily injury or attempted to cause the death of Bickham, or that he compelled her submission to the rape by threat of death or serious bodily injury to be imminently inflicted on anyone. See *Carlsen v. State*, 654 S.W.2d 444 (Tex.Cr.App.1983) (Opinion on State's motion for rehearing); *Butler v. State*, 769 S.W.2d 234 (Tex.Cr.App.1989).[15]

The circumstantial evidence does not show that appellant attempted to kill Bickham or inflicted serious bodily injury to her prior to dragging her unconscious body from the bathhouse and apparently bludgeoning her to death. Although there were signs of struggle both beside the hedge at the end of the bridge and in the bathhouse, no blood was found at either location, or anywhere in between. Nor do we find any other concrete evidence in the record to indicate appellant used force sufficient to cause death or create a substantial risk thereof, or to cause permanent disfigurement or protracted loss or impairment of any bodily member or organ. See § 1.07(34), supra.

Although by his own confession appellant knocked Bickham unconscious, the act of rendering a victim unconscious, by manner and means unknown, is not sufficient

evidence of serious bodily injury. *Fierro v. State*, 626 S.W.2d 597 (Tex.App.—El Paso 1981, pet. ref'd). Cf. *Sanchez v. State*, 543 S.W.2d 132, at 134 (Tex.Cr.App.1976) (where defendant rendered his victim unconscious and amnesic by some unknown means, "it is highly questionable that the evidence is sufficient to show serious bodily injury to constitute the felony offense charged."). It is conceivable on the evidence that appellant may have blacked Bickham's eyes and/or broken her jaw in the bathhouse or earlier, injuries which would not necessarily have produced a discernible residue of blood. Certainly the defensive wounds, bruises only, on Bickham's hands and forearms indicate she suffered some level of assaultive conduct while she was still conscious. Whether or not inflicted in the bathhouse, however, black eyes, without more, do not establish serious bodily injury. Cf. *Pickering v. State*, 596 S.W.2d 124, at 128 (Tex.Cr.App. 1980) (bruises and burns do not show serious bodily injury *per se*). As for the broken jaw, there was no specific testimony about the nature or extent of this injury; no testimony it would have constituted a "protracted" impairment of a bodily member. See *Moore v. State*, 739 S.W.2d 347, at 352 (Tex.Cr.App.1987) (Plurality opinion).

Moreover, the pathologist could not tell the chronology of Bickham's injuries. It is as consistent with the State's evidence and the evidence as a whole that these injuries were caused during the final, fatal assault as that they occurred earlier. The record provides no substantial basis to prefer either theory. Thus we are left to speculate, and even "accepting the inculpatory circumstances ... there is a reasonable hypothesis other than guilt which also would account for the circumstances." *Girard v.*

---

*Barnard* was quite different than that made here. As I said in the text, *ante* at 247, *Barnard* is inapposite. And in *Wooldridge* the evidence clearly demonstrated that serious bodily injury occurred well before the conduct that caused the death. 653 S.W.2d at 816, n. 9. To quote our belief that "this is the very conduct the Legislature sought to proscribe as a capital offense" while ignoring the footnote, and then

champion this revisionist view of *Wooldridge* as support for its construction today is, to be kind, disingenuous.

15. Our recent abandonment of the *Carlsen/Butler* "analytical construct" in *Geesa v. State*, 820 S.W.2d 154 (Tex.Cr.App.1991), was expressly made applicable only to cases tried after issuance of mandate in that cause.

*State*, 631 S.W.2d 162, at 164 (Tex.Cr.App. 1982). The State has failed to establish more than a suspicion that appellant caused serious bodily injury or attempted to cause death by conduct discrete from the killing itself. "The law deems such level of proof to be insufficient to support a conviction upon circumstantial evidence." *Pickering v. State*, supra, at 129.

Nor is there evidence of a threat of death or serious bodily injury which compelled Bickham to submit to the rape. The record contains no indication of an express threat at all.[16] Certainly the bruises on Bickham's hands and forearms tend to show a response to acts or deeds that must have conveyed *some* level of threat. However, under this Court's construction of § 21.-03(a)(2), supra, as that provision read in 1976, "absent an express verbal threat, evidence was sufficient to prove aggravated rape ... only when a gun, knife, or a deadly weapon was used, or serious bodily injury was in fact inflicted." *Rucker v. State*, 599 S.W.2d 581, at 586 (Tex.Cr.App. 1979). Here there is no evidence that a verbal threat was made, that a weapon was used, or that serious bodily injury was inflicted prior to or during the commission of the rape. Thus I would hold there is a failure of proof of a threat sufficient to show the rape was aggravated. *Rucker v. State*, supra.[17]

Accordingly we should hold that the evidence is insufficient to establish appellant's guilt for the offense of murder committed in the course of *aggravated* rape. In keeping with *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978) and *Greene v. Massey*, 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978), we should there-fore reverse the judgment of the trial court and remand the cause for entry of a judgment of acquittal. Holding instead that the elements of aggravated rape and of murder may "overlap," op. at 246, the majority does not. I respectfully dissent.

BAIRD, J., joins this opinion.

BAIRD, Judge, dissenting.

Because the majority fails to follow our policy of statutory interpretation established in *Boykin v. State*, 818 S.W.2d 782 (Tex.Cr.App.1991), I respectfully dissent. See page 245. Judge Clinton is correct; a conviction for capital murder based upon the commission of aggravated rape requires conduct that causes serious bodily injury separate from that which causes the complainant's death. At 248 (Clinton, J., dissenting). For the following reasons, I join Judge Clinton's dissent.

## I.

The majority states the general rule of statutory interpretation as follows:

When we interpret any statute, we try "to effectuate the 'collective' intent or purpose of the legislators who enacted the legislation." *Boykin v. State*, 818 S.W.2d 782, 785 (Tex.Cr.App.1991). Normally, we will accomplish this goal simply by focusing our attention on and discerning the objective meaning of the statute's literal text at the time of its enactment. *Id.* In the majority of situations, this exercise will yield an end result of effectuating the intent of the Legislature by giving effect to the statute's plain language. *Id.*

---

16. In *Harrison v. State*, 686 S.W.2d 220, at 222 (Tex.App.—Houston [1st] 1984, pet. ref'd), it was held that threatening to "knock out" a victim was sufficient to "place [her] in fear of serious bodily injury" under § 21.03, supra, as it read after the 1981 amendment. See Acts 1981, 67th Leg., ch. 96, p. 203, § 1, eff. September 1, 1981. Here there is no evidence of a verbal threat to knock Bickham out.

17. The opinion on rehearing in *Rucker* carried only a plurality of the Court, and drew a vigorous dissent from the instant writer. Nevertheless, the holding in *Rucker* was followed in

*Holder v. State*, 643 S.W.2d 718 (Tex.Cr.App. 1983). Although *Holder* was a panel opinion, with one judge dissenting, the Court later denied rehearing *en banc*. § 21.03 was amended in 1981, see Acts 1981, 67th Leg., ch. 96, p. 203, § 1, eff. September 1, 1981, the effect being to legislatively "remove *Rucker* from the jurisprudence of the State." *Richardson v. State*, 753 S.W.2d 759, at 765 (Tex.App.—Dallas 1988, no pet.). It was the version of § 21.03 in effect when *Rucker* was decided, however, that applies in the instant case.

Majority opinion at 244. According to the majority, an exception to this general rule occurs when a literal reading of a statute produces "absurd results." *Id.* at 244. Finding our capital punishment statute "susceptible to two reasonable interpretations," the majority concludes the only reasonable interpretation which fails to produce an absurd result is the prosecution of capital murder for the commission of murder wherein *any* rape occurred. *Id.* at 245–246.

In *Boykin,* we established a policy of statutory interpretation. In the formulation of that policy we stated:

When attempting to discern the collective legislative intent or purpose, we necessarily focus our attention on the literal text of the statute in question and attempt to discern the fair, objective meaning of that text at the time of its enactment. We do this because the text of the statute *is the law* in the sense that it is the only thing actually adopted by the legislators, probably through compromise, and submitted to the Governor for her signature. We focus on the literal text because the text is the only *definitive* evidence what the legislators (and perhaps the Governor) had in mind when the statute was enacted into law.

\*　　\*　　\*　　\*　　\*　　\*

If the plain language of a statute would lead to absurd results, or if the language is not plain but rather ambiguous, then *and only then,* out of absolute necessity, is it constitutionally permissible for a court to consider, in arriving at a sensible interpretation, such *extra* textual factors as executive or administrative interpretations of the statute or legislative history.

*Boykin,* 818 S.W.2d at 785–786 (emphasis in original).

Therefore, under the policy established in *Boykin,* we must view the literal text of the statute. If the plain language of the statute is clear and unambiguous, and would not lead to absurd results, we accept the literal text of the statute. However, if we determine the text is ambiguous, or would lead to an absurd result, we consider the legislative history and other interpretations of the statute. *Id.* At that point, we may turn to Tex.Gov't Code Ann. § 311.023 for assistance.[1]

## II.

At the time of the commission of this offense, the relevant portions of Tex.Penal Code Ann. § 19.03 provided:

(a) A person commits an offense if he commits murder as defined under Section 19.02(a)(1) of this code and:

(2) the person intentionally commits the murder in the course of committing or attempting to commit kidnapping, burglary, robbery, *aggravated rape,* or arson;[2]

The majority finds the literal text of the statute would lead to an "absurd" result if, in the instant case, we were to require the conduct that caused the serious bodily injury be separate from the conduct that caused the complainant's death. The majority sets forth three hypothetical situations wherein they conclude the Legislature must have intended § 19.03 to apply but would not apply if the literal text was followed. Majority opinion at 244–245. However, the majority does not provide any authority for that conclusion, nor is there an analysis of the "executive or ad-

---

1. Although the majority does not cite Tex.Gov't Code Ann. § 311.023, use of this provision is appropriate when the statute under consideration is ambiguous or would lead to an absurd result. *Boykin,* 818 S.W.2d at 786. § 311.023 provides:

In construing a statute, whether or not the statute is considered ambiguous on its face, a court may consider among other matters the:
(1) object sought to be attained;
(2) circumstances under which the statute was enacted;
(3) legislative history;

(4) common law or former statutory provisions, including laws on the same or similar subjects;
(5) consequences of a particular construction;
(6) administrative construction of the statute; and
(7) title (caption), preamble, and emergency provision.

2. All emphasis herein is supplied by the author unless otherwise indicated.

ministrative interpretations of the statute or legislative history" to determine whether the Legislature intended the capital murder statute to apply to the hypothetical situations created by the majority. Likewise, I have found no authority to support the majority's conclusion.

At the time of the enactment of § 19.03, the penal code provided for the *aggravated* commission of three of the offenses listed within § 19.03(a)(2): kidnapping and aggravated kidnapping (*See,* Tex.Penal Code Ann. § 20.03 and § 20.04); robbery and aggravated robbery (*See,* Tex.Penal Code Ann. § 29.02 and § 29.03); and, rape and aggravated rape (*See* § 21.02 and § 21.03).[3] Clearly, the Legislature could have required proof of *aggravated* kidnapping and *aggravated* robbery but refused to do so. The majority offers no explanation for Legislature's decision to specifically require proof of an *aggravated* rape to support a conviction of capital murder.

Rather, the majority fails to recognize that § 19.03 was enacted in the wake of *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (decided in conjunction with *Branch v. Texas*). Branch was sentenced to death for the offense of rape by force wherein the complainant was *not* murdered. *Branch v. State,* 447 S.W.2d 932 (Tex.Cr.App.1969). In *Branch,* the Supreme Court struck down our previous capital murder statute and mandated a statute that narrowed the class of crimes punishable by death. *Branch v. Texas,* 408 U.S. at 310–311, 92 S.Ct. at 2763 (White, J., concurring). In light of § 19.03 being enacted the term following *Branch,* we can only assume the Legislature specifically chose to require proof of *aggravated* rape in order to limit the number of death eligible offenses. Indeed, § 19.03, although amended by the Legislature in other forms,

still requires proof of an *aggravated* sexual assault.[4] Today the majority, by permitting the imposition of death for the offense of aggravated rape which was *not* committed in the course of murder as required by § 19.03, thwarts the legislative efforts to narrow the class of crimes punishable by death.

Because the majority abandons our established policy of statutory interpretation, I respectfully dissent. With these comments, I join Judge Clinton's dissent.

---

**3.** Appellant was charged with committing this offense on December 20, 1976 and was originally tried and convicted in 1977. Therefore, all references to the Penal Code herein will be to the code as it existed at that time.

**4.** It should be noted the Legislature effectively expanded the class of death eligible offenses in 1983 and 1987 by amending our statutes related to aggravated rape, renaming the offense "aggravated sexual assault." Acts 1983, 68th Leg.,

p. 5312, ch. 977, § 3, eff. Sept. 1, 1983; Acts 1987, 70th Leg., ch. 573, § 1, eff. Sept. 1, 1987; *and,* Acts 1987, 70th Leg., 2nd C.S., ch. 16, § 1, eff. Sept. 1, 1987. Therefore, the instant offense could be properly prosecuted as a capital murder had it occurred after September 1, 1983. However, those amendments are not retroactive. *Lindsey v. State,* 672 S.W.2d 892 (Tex. App.—Dallas 1984).