Opinion issued March 13, 2008









     






In The
Court of Appeals
For The
First District of Texas




NO. 01-06-01005-CR




MICHAEL FRANKLIN MATOS, Appellant

V.

THE STATE OF TEXAS, Appellee




On Appeal from the 262nd District Court
Harris County, Texas
Trial Court Cause No. 1052480




MEMORANDUM OPINION
          Appellant, Michael Franklin Matos, appeals the trial court’s judgment
convicting him for the murder of Nicky Cunningham, complainant. See Tex. Penal
Code Ann. § 19.02 (Vernon 2003). He pleaded not guilty to the jury, claiming
self-defense. See id. § 9.32. The jury found him guilty and assessed punishment at
45 years in prison. In three issues, appellant contends that the evidence that rebuts
his claim of self-defense is legally and factually insufficient to support the jury’s
finding of guilt for murder and that the trial court erred by admitting extraneous
evidence. We conclude that the evidence is legally and factually sufficient and that
the evidence was properly admitted. We therefore affirm.
Background
          Appellant, his wife, Amy Ayala, and their daughter lived in the same apartment
with complainant, complainant’s girlfriend, Laurie Young, and Young’s 11-year old
son, Daniel Lack. In December 2005, appellant told Young that he had a “crush on
her.” When Young told complainant about the comment, complainant felt
disrespected by appellant. The couples agreed that appellant and Ayala should move
out of the apartment at the end of the month.
          Around the same time, complainant introduced his friend, Jason Henderson, to
appellant. Henderson agreed to sell about $2100 worth of marijuana to appellant. 
After appellant’s comment to Young, complainant called Henderson and told him that
he wanted to “get back at [appellant] for messing with his girl.” Complainant and
Henderson decided that when the transaction for the marijuana was supposed to take
place, they would steal the money from appellant, divide the money between them,
and not deliver the drugs. About a week later, Henderson contacted appellant to set
up a time to meet for the transaction. At the meeting, appellant, who had become
suspicious, only gave Henderson $300. Henderson took the $300 and drove away
without giving appellant the drugs. Henderson contacted complainant, telling him he
had received $300 instead of $2100 as expected. Complainant and Henderson were
not upset about the amount of money because they only took the money “to teach
[appellant] a lesson.” Although Henderson told complainant he could come get his
share of the stolen money anytime, complainant never retrieved the money from
Henderson. Complainant later told Henderson to return the money to appellant
because complainant discovered that the money actually belonged to Ayala.
          During this time, appellant and Ayala decided that they would relocate to
Florida when they moved out of the apartment. Relations between the two couples
were “hostile and uncomfortable” after the incident with Henderson. Appellant and
Ayala were out of town for several days, but appellant called complainant on
December 31 to “make amends.” Complainant agreed to allow appellant and Ayala
to stay in the apartment for a few days, after which they would pack their things and
move out.
          On January 4, appellant went to a hunting store to purchase a firearm for
“protective reasons” because he was planning to move out of the apartment that day,
and he knew that complainant had recently inherited several firearms from his father. 
Because of his prior criminal record, appellant was unable to purchase a firearm, so
he decided to buy a crossbow.
          That night, complainant was at the apartment with Lack, while appellant spent
the evening loading things into a moving van with a friend. At about two thirty in the
morning, Young received a voice mail message from complainant, in which Young
could hear the conversation between appellant and complainant. In the message, the
two were laughing and “cutting it up.” Soon after, while Lack was asleep in his
bedroom, an altercation began between appellant and complainant. Lack awoke to
hear complainant say, “Why are you doing this? You’re making my life miserable.” 
Lack then heard complainant yelling for help. Lack came out of his bedroom to see
appellant holding complainant in a headlock while the two men were struggling on
the ground. Lack had some difficulty seeing without his glasses, but he was able to
distinguish between the men based on their relative size and color. He could not see
anything in either man’s hand. Complainant told Lack to call the police, but Lack
was unable to find the telephone. Complainant then told Lack to go to their
downstairs neighbor’s house to get help. However, Lack was unable to leave the
apartment because the men were struggling in front of the door, blocking the exit. 
Lack then saw appellant open the door, and the two men continued to struggle onto
the porch in front of the apartment. Lack ran downstairs past the men to their
neighbor’s door. While the men were struggling on the porch, Lack saw appellant hit
and kick complainant repeatedly. Lack believed appellant was always in control
during the fight. Through the metal bars of the stair railing, Lack also saw appellant
push complainant down the stairs in front of the apartment. Appellant then ran to the
moving van and drove away. After the neighbor did not answer, Lack stepped over
complainant’s body to run back upstairs to the apartment.
          When Lack reached the apartment, he located the phone and called his mother
at approximately three in the morning, telling her, “Mike killed Nick.” Young
ordered Lack to lock himself in his bedroom until she came home from work. When
Young arrived to the residence, she found her son, called 911, and attempted to
resuscitate the complainant. When he arrived at the scene, Houston Police Officer
Button saw complainant lying at the bottom of the stairs.
          Officer Duncan with the Houston Police Department’s Crime Scene Unit
documented the evidence. He noted that complainant had a large surface injury to his
face. He also detailed knife wounds to complainant’s hand, which the officer
characterized as defensive injuries. He also noted multiple stab wounds to the chest
and neck area. Officer Duncan photographed the crime scene. While photographing
the scene, he found blood stains on the couch that suggested someone was sitting on
the couch when a serious injury to the neck or face occurred. The couch blood stains
were not smeared, which suggested that the injury occurred early in the struggle and
that the injured party moved from the seated position. The transfer blood stains on
the baseboard of the wall near the front door suggested that a bloodstained object
such as clothing, hair or a hand was pressed up against the wall. Other blood stains
on the wall were “medium velocity spatter” stains, consistent with some action such
as kicking or punching someone with an already existing wound. Outside the
apartment, Officer Duncan noted that there were several drip stains at the top of the
stairs, as if someone was seated or stopped there for a short moment. On the stairs,
the blood stains were consistent with someone rolling lengthwise down the stairs
because there was blood on both sides of the stairs. Officer Duncan also noted that
there was no blood leaving the scene, suggesting that appellant did not sustain serious
injuries in the fight.
          Officer Duncan found two knives at the scene, one inside the apartment and
one just outside the front door at the top of the stairs. He also found a 20-pound
dumbbell with transfer blood stains on it, as if someone had attempted to grab the
dumbbell after coming into contact with blood.
          Later, but still on the same day of the murder, appellant called Henderson and
demanded his money back from him. Appellant told Henderson, “I killed your boy
and you next.” Henderson contacted police, who advised him to continue trying to
contact appellant so that the police could locate him. The following day, appellant
again called Henderson, describing in more detail how he killed complainant. In that
call, appellant stated that complainant “put up a good fight,” that it took him 20
minutes to kill complainant, and that Henderson “should have heard his scream when
he stuck him.” After Henderson told appellant that he had appellant’s money, he
hung up because the conversation upset him. Henderson gave another statement to
police after the second call.
          Two days after the murder, police arrested appellant in Florida. A police
officer’s search of appellant for injuries resulting from the fight revealed only small
scratches on appellant’s shoulder and nicks on his hands. Only one cut on appellant’s
finger was consistent with a knife wound. He had no major cuts or lacerations, and
all injuries were of the type that appellant could have sustained while moving. 
Murder charges were filed against appellant after he was identified by Lack in a photo
line-up.
          At trial, Dr. Ana Lopez, the medical examiner, testified that complainant had
a total of 18 sharp force injuries on his face, neck, chest, shoulder, and hands. She
stated that complainant died from the multiple stab wounds to his neck because at
least one punctured his jugular vein, meaning complainant would only be able to fight
for a minute or two before the blood loss would render him incapable. She also said
that the wounds to complainant’s hands were defensive wounds. The toxicology
report also showed that complainant had a significant amount of PCP in his blood at
the time of his death.
          In his defense, appellant called a pathologist, Dr. Paul Radelat, and a
toxicologist, Terry Danielson, both of whom testified to the effects that PCP can have
on a person. Both stated that PCP can make people behave in different ways but that
it often makes people aggressive and violent. During cross-examination, Dr. Radelat
stated that the violent behavior occurs in roughly two-thirds of people who take PCP. 
The other one-third of people become more sedate, as PCP was originally developed
as an anesthetic. He testified that he could not determine how complainant had
reacted to the PCP. Young and Henderson testified that they had seen complainant
while he was under the influence of PCP many times. Both stated that complainant
was calm and relaxed, and they had never seen him act aggressively while on PCP.
          Appellant testified in his own defense at trial. In his testimony, he gave a
different version of the events leading up to the death of complainant. Appellant
stated that after he dropped off his friend who had been helping him move, he
returned to the apartment. Complainant approached appellant with his hood pulled
over his face and punched him. Complainant then pulled out a knife with his left
hand, grabbing appellant’s shirt with his other hand. Complainant told appellant to
give him the money and get out of the apartment. Complainant also asked where the
marijuana he was supposed to buy from Henderson was. Appellant responded that
he did not have any more money nor did he have the marijuana, and he took out his
wallet to show he had no money. Appellant tried to grab complainant’s knife but
instead grabbed his fist, causing complainant to drop the knife. They struggled
briefly, but complainant was able to pick up the knife again. Appellant pulled out his
own knife, and they began slashing at each other. Appellant saw complainant’s hand
getting cut when blocking appellant’s knife. Appellant said he was able to avoid
getting cut by using his knife to block complainant’s attack. Appellant stabbed
complainant in the chest, causing complainant to drop his knife again. Appellant
threw his knife and tried to gather his things to leave the house. Appellant then saw
that complainant reached his knife and was approaching him with it. When appellant
saw complainant, he reached for his crossbow, loaded it, and shot complainant in the
face. The arrow grazed complainant’s face but stuck in the side of his face. 
Complainant pulled the arrow out of his own face and attempted to stab appellant
with the arrow. They struggled on the floor, during which time the arrow broke and
complainant ended up straddling appellant. While complainant was on top of him,
appellant heard complainant yell for Lack to get help. Complainant reached for the
20-pound dumbbell while appellant reached for a knife. Appellant reached the knife,
but complainant had his right hand on appellant’s neck and the dumbbell in his left
hand. Appellant began blindly stabbing at complainant’s chest and neck. After being
stabbed, complainant let go of the dumbbell and fell off of appellant. Appellant left
the knife in complainant’s neck, gathered his things, and left the apartment. After he
got downstairs, appellant realized that he had left his wallet. He headed back to the
apartment to see complainant sitting at the top of the stairs and Lack knocking on the
downstairs neighbor’s door. He decided not to return to the apartment, instead going
to the hotel where his wife was staying. He and Ayala left immediately for Florida. 
          Appellant’s description of the phone call to Henderson differs from
Henderson’s. Appellant testified that he called Henderson about the stolen money but
did not threaten Henderson. Instead, appellant said that he told Henderson that
complainant tried to rob and kill him, and that they fought.
          Appellant also presented the testimony of a neighbor, Tamberlin Carr. Carr
testified that Lack could not see without his glasses and that, in her opinion, Young
did not always tell the truth.
Sufficiency of the Evidence
          In his first two issues, appellant contends that the evidence is legally and
factually insufficient to support his conviction because the State did not rebut his
assertion of self-defense beyond a reasonable doubt. Appellant does not challenge
the elements of the offense of murder and appeals only the sufficiency of the evidence
concerning the jury’s rejection of his self-defense claim. Appellant’s challenges to
the legal and factual sufficiency of the evidence are premised on the same evidence,
with a primary focus on his own testimony that complainant was the initial aggressor. 
Appellant says that Lack did not see the beginning of the fight or any weapon in
anyone’s hand. Appellant refers to the physical evidence that a knife was found at
the top of the stairs, which he says shows the complainant had a knife. Appellant
contends that the lack of blood outside the door to the apartment or on the porch
shows he was not intending to harm complainant. In addition, appellant says
complainant was intoxicated with PCP, a drug that makes people violent. A. Self-defense
          A person commits the offense of murder if he intentionally or knowingly
causes the death of an individual, or intends to cause serious bodily injury and
commits an act clearly dangerous to human life that causes the death of an individual. 
Tex. Penal Code Ann. § 19.02(b)(1), (2) (Vernon 2003). However, a person is
generally justified in using deadly force against another if he reasonably believes that
deadly force was necessary to protect himself against the other’s use or attempted use
of unlawful deadly force, and a reasonable person in the actor’s situation would not
have retreated. Tex. Penal Code Ann. §§ 9.31(a), 9.32(a) (Vernon 2003). A
defendant has the burden of producing some evidence to support a claim of self-defense. Zuliani v. State, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003) (analyzing
burden of persuasion under factual sufficiency challenge); see also Saxton v. State,
804 S.W.2d 910, 913–14 (Tex. Crim. App. 1991) (cited in Zuliani as properly
analyzing burden of persuasion in legal sufficiency challenge). Once the defendant
produces some evidence, the State then bears the burden of persuasion to disprove the
raised defense. Zuliani, 97 S.W.3d at 594. The burden of persuasion does not require
the State to produce evidence; it requires only that the State prove its case beyond a
reasonable doubt. Id. A determination of guilt by the fact-finder implies a finding
against the defensive theory. Id. The issue of self-defense is a fact issue to be
determined by the jury, which is free to accept or reject the defensive issue. Saxton,
804 S.W.2d at 913–14. “In resolving the sufficiency of the evidence issue, we look
not to whether the State presented evidence which refuted appellant’s self-defense
testimony, but rather we determine whether after viewing all the evidence in the light
most favorable to the prosecution, any rational trier of fact would have found the
essential elements of murder beyond a reasonable doubt and also would have found
against appellant on the self-defense issue beyond a reasonable doubt.” Id. at 914.
B. Legal Sufficiency
          In a legal sufficiency review, we consider the entire trial record to determine
whether, viewing the evidence in the light most favorable to the verdict, a rational
jury could have found the accused guilty of all essential elements of the offense
beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 318–19, 99 S. Ct.
2781, 2788–89 (1979); Vodochodsky v. State, 158 S.W.3d 502, 509 (Tex. Crim. App.
2005). In conducting our review of the legal sufficiency of the evidence, we do not
reevaluate the weight and credibility of the evidence; rather, we ensure only that the
jury reached a rational decision. Muniz v. State, 851 S.W.2d 238, 246 (Tex. Crim.
App. 1993).
          Viewing the evidence in a light most favorable to the jury’s verdict, the
evidence shows that complainant died from multiple stab wounds that were
undisputedly caused by appellant. The blood stain evidence suggests that
complainant was seated on the couch when he received the wound to his face. Lack
awoke when he heard complainant pleading for him to help and to call the police. 
Lack saw appellant always in control of the fight with complainant. Lack also saw
appellant push complainant down the stairs. After appellant killed complainant, he
called Henderson to tell him that he would be next. Furthermore, the only wounds
noted on appellant when he was arrested several days later were a few small cuts on
appellant’s hand, which were consistent with packing and moving. By contrast,
complainant had 18 sharp-force injuries and was shot in the face with an arrow from
a crossbow, which appellant bought shortly before going to complainant’s apartment
when he was denied the opportunity to purchase a firearm. The medical examiner
testified that complainant had defensive injuries to his hands, consistent with
complainant trying to protect himself from the knife. Although complainant had
ingested PCP, evidence shows that some people do not act violently from that drug
and that complainant was not known to react violently from consuming it.
          We conclude the jury could have properly rejected appellant’s testimony by
finding it lacked credibility. See Muniz, 851 S.W.2d at 246. Viewing the evidence
in the light most favorable to the jury’s verdict, we conclude that a rational trier of
fact could have found against appellant on the self-defense issue beyond a reasonable
doubt. Saxton, 804 S.W.2d at 914; see also Tex. Penal Code Ann. § 9.32(a). We
hold the evidence is legally sufficient to support appellant’s conviction. We overrule
appellant’s first issue.
C. Factual Sufficiency
          When conducting a factual-sufficiency review, we view all of the evidence in
a neutral light. Ladd v. State, 3 S.W.3d 547, 557 (Tex. Crim. App. 1999). We will
set the verdict aside only if (1) the evidence is so weak that the verdict is clearly
wrong and manifestly unjust or (2) the verdict is against the great weight and
preponderance of the evidence. Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App.
2000). Under the first prong of Johnson, we cannot conclude that a conviction is
“clearly wrong” or “manifestly unjust” simply because, on the quantum of evidence
admitted, we would have voted to acquit had we been on the jury. Watson v. State,
204 S.W.3d 404, 417 (Tex. Crim. App. 2006). Under the second prong of Johnson,
we cannot declare that a conflict in the evidence justifies a new trial simply because
we disagree with the jury’s resolution of that conflict. Id. Before finding that
evidence is factually insufficient to support a verdict under the second prong of
Johnson, we must be able to say, with some objective basis in the record, that the
great weight and preponderance of the evidence contradicts the jury’s verdict. Id. In
conducting a factual-sufficiency review, we must also discuss the evidence that,
according to the appellant, most undermines the jury’s verdict. See Sims v. State, 99
S.W.3d 600, 603 (Tex. Crim. App. 2003).
          We may not re-weigh the evidence and substitute our judgment for that of the
fact-finder. King v. State, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000). The fact-finder alone determines what weight to place on contradictory testimonial evidence
because that determination depends on the fact-finder’s evaluation of credibility and
demeanor. Cain v. State, 958 S.W.2d 404, 408–09 (Tex. Crim. App. 1997). As the
determiner of the credibility of the witnesses, the fact-finder may choose to believe
all, some, or none of the testimony presented. Id. at 407 n.5.
          Appellant points to his own testimony to show that complainant lunged at him
with a knife and was the initial aggressor in the fight. The jury, however, could
disregard his testimony by determining that he lacked credibility. See id.
          Appellant challenges Lack’s testimony by noting that Lack did not see the
beginning of the fight or a weapon in anyone’s hand. Although the record supports
appellant’s contention that Lack did not see the beginning of the fight or a knife in
anyone’s hand, the record shows that Lack observed the fight sufficiently to notice
that appellant was the one in control during the physical attack. Lack also saw
appellant’s violence in pushing complainant down the stairs. Lack also said that
complainant asked for help and requested that the police be called.
          Appellant refers to the physical evidence that a knife was found at the top of
the stairs, which he says shows the complainant had a knife. However, the record
does not show that the knife was the complainant’s. 
          Appellant also asserts that the blood stains on the stairs were inconsistent with
the State’s witnesses’ testimony of the events. Appellant states that the blood stains
are consistent with his version that complainant sat at the top of the stairs and fell by
himself. However, Officer Duncan testified that the blood stains were consistent with
Lack’s testimony that complainant rolled lengthwise down the stairs. Officer Duncan
also testified that the blood stains on the baseboards inside the house are consistent
with Lack’s testimony that appellant kicked complainant and reached for the door
during the struggle. Furthermore, the fact that defensive evidence is consistent with
the physical evidence at the scene of the offense does not in itself render the State’s
evidence insufficient because the jury is the sole determiner of credibility and the jury
is free to accept or reject the defensive evidence. Saxton, 804 S.W.2d at 914.
          Appellant also points to the evidence of PCP in complainant’s system as
evidence of complainant’s behavior. Appellant testified that complainant was acting
strangely and was aggressive towards him. Appellant offered testimony from police
officers and a doctor that PCP often made people violent and aggressive. He also
stated that it was necessary for appellant to stab complainant many times in order to
protect himself because the PCP caused complainant to behave aggressively. 
However, the doctor also testified that PCP does not have the same effect on all
people and that it has a sedative effect in roughly one-third of the people who take it. 
Both Young and Henderson testified that they had seen complainant high on PCP
many times over eight years and that the drug made him calm and relaxed. Young
further testified that she had never seen complainant act aggressively while on the
drug. From this evidence, the jury could have reasonably concluded that complainant
was not aggressive while on PCP. See Muniz, 851 S.W.2d at 246.
          Other evidence is also inconsistent with appellant’s claim of self-defense.
Complainant died from multiple stab wounds that were undisputedly caused by
appellant. The blood stain evidence suggests that complainant was seated on the
couch when he received the wound to his face. After appellant killed complainant,
he called Henderson to tell him that he would be next. Furthermore, the only wounds
noted on appellant when he was arrested several days later were a few small cuts on
appellant’s hand, which were consistent with packing and moving. By contrast,
complainant had 18 sharp-force injuries and was shot in the face with an arrow from
the crossbow appellant bought shortly before going to complainant’s apartment when
he was denied the opportunity to purchase a firearm. The medical examiner testified
that complainant had defensive injuries to his hands, consistent with complainant’s
trying to protect himself from the knife.
          We cannot re-weigh the evidence; rather, we must only determine whether the
evidence is so weak that the jury’s verdict is clearly wrong. See King, 29 S.W.3d at
562. We conclude that, when all the evidence is viewed in a neutral light, the State
met its burden of persuasion to disprove self-defense, and the evidence to establish
murder is neither so weak that it undermines confidence in the jury’s finding of guilt,
nor is appellant’s evidence so strong that the State’s burden to prove murder beyond
a reasonable doubt was not met. See Watson v. State, 204 S.W.3d at 416–17; see also
Zuliani, 97 S.W.3d at 594–95. We hold that the evidence is factually sufficient to
support appellant’s conviction. We overrule appellant’s second issue.
Admission of Evidence of Extraneous Offense
           In his third issue, appellant contends that the trial court abused its discretion
by allowing the State to introduce evidence of an extraneous offense during trial. 
Specifically, appellant challenges the admission of evidence of a threatening phone
call made by appellant hours after the death of the complainant because the State did
not give appellant notice of its intent as required under Rule 404(b). See Tex. R.
Evid. 404(b). Appellant concedes that the State’s theory of motive was a valid reason
for admitting the evidence of appellant’s threatening call to Henderson. Appellant
challenges only the lack of notice of the State’s intent to use evidence about the call
under Rule 404(b). The State responds that no notice was required because the call
to Henderson, which occurred on the same day of the murder, was evidence that arose
from the same transaction.
          We review the trial court’s admission of extraneous-offense evidence for abuse
of discretion. Moses v. State, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). Rule
404(b) allows admission of extraneous evidence “provided that upon timely request
by the accused in a criminal case, reasonable notice is given in advance of trial of
intent to introduce in the State’s case-in-chief such evidence other than that arising
in the same transaction.” Tex. R. Evid. 404(b) (emphasis added). “Same transaction
contextual evidence” is evidence reflecting the context in which a criminal act
occurred, recognizing that events do not occur in a vacuum, and a jury has a right to
hear what occurred immediately before and after the offense in order to realistically
evaluate the evidence. Wesbrook v. State, 29 S.W.3d 103, 115 (Tex. Crim. App.
2000). “Such evidence imparts to the trier of fact information essential to
understanding the context and circumstances of events which, although legally
separate offenses, are blended or interwoven.” Camacho v. State, 864 S.W.2d 524,
532 (Tex. Crim. App. 1993). To be admissible under Rule 404(b), same transaction
contextual evidence must be necessary to the jury’s understanding of the offense. 
Wyatt v. State, 23 S.W.3d 18, 25 (Tex. Crim. App. 2000). Thus, necessity is the
“other purpose” for which same transaction contextual evidence is admissible under
Rule 404(b). Rogers v. State, 853 S.W.2d 29, 33 (Tex. Crim. App. 1993). Such
necessity can exist because (1) several offenses are so intermixed or connected as to
form a single, indivisible criminal transaction, such that in narrating the one, it is
impracticable to avoid describing the other; or (2) the same transaction contextual
evidence tends to establish some evidentiary fact, such as motive or intent. Id. Same
transaction contextual evidence is admissible “not for the purpose of showing
character conformity, but to illuminate the nature of the crime alleged.” Camacho,
864 S.W.2d at 532.
          In the present case, appellant called Henderson on the same day appellant
murdered complainant. During that call, he asked Henderson if Henderson had
appellant’s money, telling Henderson that he had killed complainant and that
Henderson was “next.” These statements, when taken together, tend to establish that
appellant’s motive or intent was to intentionally cause the death of complainant in
retaliation for the money stolen by Henderson, at the request of complainant. See
Wyatt, 23 S.W.3d at 25–26. The trial court could have reasonably determined that,
because the statements established motive or intent and were made on the same day
as the murder, the statements provided information essential to the jury’s
understanding of the context and circumstances surrounding the murder, and
therefore no notice was required by the State. Camacho, 864 S.W.2d at 532. We
hold that the trial court did not abuse its discretion by allowing the State to introduce
evidence of appellant’s call to Henderson. We overrule appellant’s third issue.

Conclusion
          We affirm the judgment of the trial court.
 
 
                                                             Elsa Alcala
                                                             Justice
 
Panel consists of Justices Taft, Keyes, and Alcala.
Do not publish. Tex. R. App. P. 47.2(b).