



## MEMORANDUM OPINION

No. 04-09-00386-CR

John David **GONZALEZ**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 79th Judicial District Court, Brooks County, Texas
Trial Court No. 08-01-09851-CR
Honorable Richard C. Terrell, Judge Presiding

Opinion by:    Karen Angelini, Justice

Sitting:       Catherine Stone, Chief Justice
               Karen Angelini, Justice
               Marialyn Barnard, Justice

Delivered and Filed:  July 7, 2010

AFFIRMED

John David Gonzalez appeals his conviction for aggravated assault with a deadly weapon. In one issue on appeal, Gonzalez contends the trial court committed charge error by refusing to include an instruction on self-defense in the court's charge to the jury. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

During the course of the jury trial, numerous witnesses testified to the events surrounding the aggravated assault allegation against Gonzalez.

*1. Daniel Davila*

On the night of the incident, Daniel Davila, an officer with the Brooks County Sheriff's Department, was dispatched to Garza's Drive-Thru because of a shooting. Officer Davila testified that upon arriving at the drive-thru, he saw a black pick-up truck driven by Rogelio Martinez. According to Officer Davila, Rogelio told him that the passenger in the truck, Rosendo Martinez, had been shot in the back of the head. Officer Davila observed damage to the rear windshield on the passenger side of the pick-up truck, which appeared to have been caused by a shotgun. Rogelio told Officer Davila that there had been a fight at Lopez Park on Nava Street and that Gonzalez had shot at the pick-up truck, hitting Rosendo. Based on this information, Officer Davila went to Lopez Park where he recovered two spent shotgun shells and buck shot. While he was at Lopez Park, he received a call from the dispatcher advising him that Gonzalez had called 9-1-1 and stated that he was waiting for deputies at his residence. Officer Davila then went to Gonzalez's residence and spoke with Gonzalez. Officer Davila testified that near the front door of Gonzalez's house, he noticed a shotgun leaning against the wall. According to Officer Davila, he then took Gonzalez to the police station for an interview.

Officer Davila's investigation revealed that, prior to the shooting in Lopez Park, the first people to arrive at the park were Gonzalez and Jonathan Nino. They were in a black Super Sport pick-up truck owned by Nino. Nino's shotgun was in the pick-up truck. Officer Davila's investigation revealed that the two men were waiting at the park so that they could have an altercation with Rogelio. Rogelio and Rosendo then arrived at the park in Rogelio's black Ford pick-up truck. Rogelio was driving, and Rosendo was the passenger. A third vehicle, a white Crown Victoria, also arrived at the park. Juan Godinez and Jose Vallejo were in the Crown Victoria.

*2.       Rogelio Martinez*

Rogelio Martinez testified that about a week before the night of the shooting, he, Rosendo, and Jose Vallejo, encountered Gonzalez at a Diamond Shamrock. According to Rogelio, Gonzalez was sitting in a vehicle when Rogelio, Rosendo, and Vallejo approached Gonzalez in an aggressive manner. Rogelio admitted that Gonzalez had not acted in an aggressive manner toward them. The chief of police then appeared and broke things up.

Rogelio testified that on the evening in question, he was "cruising around" with his cousin, Rosendo, when they saw Gonzalez riding in a black Super Sport pick-up truck with Nino. According to Rogelio, Gonzalez and Nino were yelling at and acting in an aggressive manner toward him and Rosendo. Rogelio testified that later, he and Rosendo saw Gonzalez and Nino again at the Pizza Hut where the yelling continued. And, although there was an exchange of words, there was no argument or confrontation at that time. According to Rogelio, he and Rosendo saw Gonzalez and Nino for a third time at Lopez Park on Nava Street. When he saw Gonzalez and Nino, Rogelio called his brother, Juan Godinez, and asked to speak to a friend, Jose Vallejo. Rogelio then asked Vallejo to come to the park and be a witness in case anything happened. Rogelio testified that he was concerned that Gonzalez might pull a gun on him and Rosendo. According to Rogelio, he intended to fight Gonzalez, but waited until he saw Vallejo, who was driving a white Crown Victoria. Rogelio testified that Gonzalez was parked at the basketball court in the park and that Gonzalez and Nino were drinking beer near their vehicle. So, Rogelio walked toward Gonzalez with Vallejo driving behind Rogelio. Rosendo remained in the vehicle. According to Rogelio, he did not have a gun and never threatened Gonzalez. Gonzalez then approached Rogelio, and they exchanged words. Rogelio testified that Gonzalez threatened him by saying that Gonzalez was a gang member and that Gonzalez had people

coming out of prison who could have Rogelio killed. Rogelio testified that he then motioned for Vallejo, who was still in his vehicle, to come a little closer so that he could hear what Gonzalez was saying. Vallejo did so, still remaining in his vehicle. According to Rogelio, Vallejo never threatened Gonzalez. At that point, Rogelio testified that Gonzalez went to the Super Sport truck, pulled out the shotgun, and fired a shot in the air. Gonzalez started taunting Rogelio with the shotgun, as if he was going to shoot Rogelio. According to Rogelio, he then ran back to his own vehicle and drove off. Rogelio testified that as he was driving away, Gonzalez shot the back window, hitting Rosendo in the neck and shoulder. Rogelio yelled at Vallejo to call 9-1-1 and drove to Garza's Drive-Thru.

*3.     Rosendo Martinez*

Rosendo Martinez testified that on the night of the shooting, he was with his cousin, Rogelio. According to Rosendo, they saw Gonzalez at the Pizza Hut. Rogelio and Gonzalez then got out of their respective vehicles and began arguing. Both men then got back in their vehicles. Rosendo testified that when he and Rogelio went to Lopez Park later that night, they saw Gonzalez and Nino again. Vallejo and Godinez also came to the park in a white Crown Victoria. According to Rosendo, Gonzalez and Rogelio had a confrontation. Gonzalez shoved Rogelio. Gonzalez went to his vehicle, pulled out the shotgun, and fired it in the air. Gonzalez then pointed the shotgun at Rogelio, and Rogelio started backing away. Rogelio then got back into the vehicle, and he and Rosendo started to leave. Rosendo testified that as they were driving away, he saw Gonzalez fire a second time; Rosendo then felt his chest burn, his ears ringing, and he lost consciousness.

*4.     Jose Vallejo*

Jose Vallejo testified that on the evening in question, he was with Godinez at Godinez's house. Rogelio called Godinez's cell phone and asked to speak with Vallejo. Vallejo testified that he was told by Rogelio to meet him at Lopez Park on Nava because "[Rogelio] was going to get the grudge off of him, . . . between John Gonzalez." According to Vallejo, he took Godinez with him and drove his Crown Victoria to the park. Neither Vallejo nor Godinez had weapons. Further, neither Rogelio nor Rosendo had weapons. When Vallejo and Godinez arrived at the park, Gonzalez and Nino were standing outside their vehicle. Vallejo testified that Rogelio then got out of his vehicle, but Rosendo remained inside. According to Vallejo, Rogelio and Gonzalez began arguing. Vallejo remained in his own vehicle. Rogelio then told Vallejo to come a little closer. Vallejo testified that he then saw Gonzalez walk towards Nino's pick-up, pull out a shotgun, and fire one shot in the air. At that time, both Vallejo and Godinez got out of the Crown Victoria. Rogelio reacted by going back to his pick-up. Gonzalez rushed toward Rogelio and pointed the gun at Rogelio's chest. Rogelio then turned to leave. Vallejo testified that he and Godinez were also leaving when Vallejo saw Gonzalez shoot at Rogelio's pick-up. According to Vallejo, he did not see Rogelio or Rosendo pull out a weapon or make threatening gestures towards Gonzalez. Vallejo testified that after the shooting, he and Godinez went to an acquaintance's house to call for help.

*5.     Juan Godinez*

Juan Godinez, Rogelio's brother, testified that on the night of the shooting, he was at his house with Vallejo when Rogelio called him and asked to speak to Vallejo. According to Godinez, Rogelio asked Vallejo to meet him at the park. Godinez went with Vallejo to the park where they met Rogelio. When they arrived at the park, Rogelio got out of his vehicle and

approached Gonzalez while Godinez and Vallejo remained in their vehicle. Rogelio and Gonzalez then began arguing. According to Godinez, Gonzalez shoved Rogelio, and Rogelio motioned for Vallejo and Godinez to move closer. They did so and then exited their vehicle. Godinez testified that Gonzalez then took a gun out of his cousin's truck and shot it in the air. Gonzalez pointed the gun at Rogelio, and Rogelio got in his truck and took off. Godinez testified that he and Vallejo got into their vehicle and left also. Godinez then saw Gonzalez shoot towards Rogelio. The shot hit the truck on the passenger side. According to Godinez, Rogelio then stopped his truck and yelled at Godinez and Vallejo to call 9-1-1. Godinez and Vallejo then went to Vallejo's girlfriend's house because her uncle is a deputy.

*6.     Jonathan Nino*

Jonathan Nino, Gonzalez's cousin, testified that about a week before the shooting, he was at the Diamond Shamrock when he saw an argument between Gonzalez and Rogelio, Rosendo, Godinez, and Vallejo. Nino testified that on the evening of the shooting, he was drinking with Gonzalez at Gonzalez's house. Nino testified that he then decided to go get some beer and his shotgun so that he and Gonzalez could shoot the shotgun at Gonzalez's ranch. According to Nino, he and Gonzalez both shot the shotgun in the air at the ranch. So, when he and Gonzalez left the ranch, the shotgun was in the back seat and was empty. As they drove around town, they drove by the Pizza Hut where they saw Rogelio and Rosendo. According to Nino, Gonzalez and Rogelio both got out of their respective vehicles and began arguing. Both men then got back in the vehicles. Nino testified that he and Gonzalez went to get more beer and then went to Lopez Park to continue drinking. Later, Nino saw Rogelio's truck come into the park; the truck was followed by the arrival of a white Crown Victoria. According to Nino, Rogelio and Gonzalez began arguing again. Gonzalez pushed Rogelio, and Rogelio motioned for the Crown Victoria to

come closer. Nino then saw Gonzalez push Rogelio a second time, and both occupants of the Crown Victoria got out of the car. Although Nino saw the two men start walking toward where Rogelio and Gonzalez were, Nino testified that the two men did not threaten anyone. According to Nino, at that point, Gonzalez went to Nino's truck, got the shotgun, and shot once into the air. Nino then saw Rogelio walk away from Gonzalez. Nino saw the two men get back into the Crown Victoria and leave. According to Nino, Rogelio was still standing by the driver's side door of his vehicle, and Gonzalez was waving the gun in the air. Nino then saw Gonzalez fire the gun toward Rogelio's truck as it was driving away from Gonzalez. Nino and Gonzalez then returned to Gonzalez's house.

*7.     John David Gonzalez*

John David Gonzalez testified that about a week and a half before the shooting involving Rogelio, Rosendo, and Vallejo, there had been an incident at the Diamond Shamrock. According to Gonzalez, he was sitting in a car when Rogelio approached him and started arguing with him. Gonzalez testified that although there was a confrontation, it was not physical. The chief of police showed up, and Gonzalez and Rogelio went their separate ways.

According to Gonzalez, on the evening of the shooting, he was at his ranch when his cousin, Nino, arrived in a black SS Super Sport. They drank beer for a couple of hours. Nino had his shotgun with him, and they shot it a couple of times before going back into town to go riding around. The shotgun was in the backseat of the vehicle. They then saw Rogelio and Rosendo driving around and met up with them again at the Pizza Hut. Gonzalez testified that both he and Rogelio got out of their respective vehicles and began arguing. They then got back in their respective vehicles. According to Gonzalez, he and Nino then went to get more beer. After getting beer, they went to Lopez Park and got out of the vehicle. Gonzalez then saw Rogelio's

truck pass by the park. According to Gonzalez, Rogelio's truck and a white Crown Victoria parked. Gonzalez testified that he then saw the two vehicles coming toward him. The black truck was coming first. Gonzalez testified that he saw Rogelio get out of the vehicle and begin walking toward him. According to Gonzalez, Rogelio did not have a weapon on him. He and Rogelio started arguing. Gonzalez then saw Rogelio signal to the driver of the Crown Victoria, and it started coming toward them. Gonzalez testified that he tried to make peace with Rogelio by offering him his hand, but Rogelio cussed at him and slapped his hand away. So, Gonzalez pushed Rogelio. Gonzalez then saw Rogelio signal the men in the Crown Victoria, and the men got out of the Crown Victoria. Gonzalez saw Godinez, one of the men in the Crown Victoria, walk around the car to the front; according to Gonzalez, it looked like Godinez had a black handgun in his right hand below his waist. Gonzalez testified that Godinez and Vallejo were both walking toward him slowly. According to Gonzalez, when he saw what appeared to be a gun, he feared for his life. Gonzalez testified that he was afraid Godinez was going to shoot him. However, Gonzalez admitted that there was nothing to prevent him from getting in the truck and leaving the park. Instead, Gonzalez testified that he went to the Super Sport and pulled out the shotgun. He loaded the shotgun and shot once in the air. Gonzalez testified that Godinez and Vallejo moved back toward their car. Gonzalez saw Rogelio run to his truck on the driver's side so that he was standing right next to the driver's side with the door open. Gonzalez testified that Vallejo got in the Crown Victoria on the driver's side. Gonzalez saw Godinez walking slowly to the passenger side of the Crown Victoria and get inside the vehicle. Gonzalez then saw Vallejo drive the Crown Victoria back toward the way it had entered the park. The truck, driven by Rogelio, reversed and headed back where Gonzalez and Nino were. Gonzalez testified that Rogelio's truck then passed by him going about two to three miles per hour. When it got closer

and was passing by him, Gonzalez shot the second time. According to Gonzalez, at this point, he had not noticed there was a passenger in Rogelio's truck. Gonzalez testified that he thought Rogelio was going to shoot back at him. According to Gonzalez, he fired the second shot because he was concerned for his safety and thought he was still in danger. He testified that he was not aware that the shot had hit the pick-up truck. He and Nino then went to Gonzalez's house where he asked Nino to leave the shotgun with him. He then called 9-1-1. Officer Davila came to Gonzalez's residence, recovered the shotgun, and took Gonzalez with him.

At the close of the evidence, Gonzalez requested a self-defense instruction to be included in the jury charge. The trial court denied the requested instruction. The jury found Gonzalez guilty of aggravated assault with a deadly weapon. He was sentenced to ten years in prison and a $10,000 fine. In his only issue on appeal, Gonzalez argues he was entitled to the self-defense instruction.

## DISCUSSION

### A.    *Standard of Review*

In determining whether there is jury charge error, we first decide whether error exists. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). If we find error, we then engage in a harm analysis. *Id.* When we review the trial court's denial of a requested defensive instruction, we view the evidence in the light most favorable to the defendant. *Granger v. State*, 3 S.W.3d 36, 38 (Tex. Crim. App. 1999).

### B.    *Applicable Law*

A defendant is entitled to a jury instruction on every claimed defensive issue where the evidence at trial raises each element of the defense. *Id.* The credibility, source, or strength of the evidence is immaterial. *Id.*; *Hamel v. State*, 916 S.W.2d 491, 493 (Tex. Crim. App. 1996). The

evidence raising the defensive issue may be strong, weak, contradicted, unimpeached, or unbelievable. *Granger*; 3 S.W.3d at 38; *Muniz v. State*, 851 S.W.2d 238, 254 (Tex. Crim. App. 1993). The defendant's testimony alone is sufficient to raise a defensive issue requiring an instruction in the jury charge. *Hayes v. State*, 728 S.W.2d 804, 807 (Tex. Crim. App. 1987). However, if the evidence fails to raise a defensive issue, the trial court does not err in refusing the requested instruction. *Kunkle v. State*, 771 S.W.2d 435, 443-44 (Tex. Crim. App. 1986).

Section 9.31(a) of the Texas Penal Code provides that "[e]xcept as provided in Subsection (b), a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." TEX. PENAL CODE ANN. § 9.31(a) (Vernon Supp. 2009). Section 9.32(a) provides,

> A person is justified in using deadly force against another: (1) if the actor would be justified in using force against the other under Section 9.31; and (2) when and to the degree the actor reasonably believes the deadly force is immediately necessary; (A) to protect the actor against the other's use or attempted use of unlawful deadly force; or (B) to prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery.

TEX. PENAL CODE ANN. § 9.32(a) (Vernon Supp. 2009). Reasonableness of the defendant's belief that force was immediately necessary to defend himself is viewed from the defendant's standpoint at the time he acted. *Tanguma v. State*, 721 S.W.2d 408, 412 (Tex. App.—Corpus Christi 1986, pet. ref'd). The term "reasonably believes" in section 9.32 includes the concept that a defendant is justified in defending against danger as he reasonably apprehends it. *Hamel*, 916 S.W.2d at 493.

*C.*     *Application of the Law*

Gonzalez argues that the evidence raises the issue of self defense. He points out that, viewing the evidence in the light most favorable to him, Godinez, the passenger in the Crown Victoria, had a handgun, which caused him to fear for his life. Fearing for his life, Gonzalez argues that he went to retrieve the shotgun from the truck, loaded it, and fired a warning shot in the air. According to Gonzalez, Godinez, Vallejo, and Rogelio then moved back to their vehicles. Godinez and Vallejo drove away, while Rogelio stood beside the driver door of his vehicle before getting back into the vehicle. Gonzalez theorizes that, while he was loading the shot gun, "Godinez had an opportunity to pass the handgun to Rogelio." Then, because Rogelio drove toward Gonzalez very slowly, Gonzalez thought Rogelio was going to shoot at him; therefore, he shot at Rogelio's truck. According to Gonzalez, it was reasonable for him to believe Rogelio had obtained the handgun from Godinez or had his own weapon because Rogelio lingered by the driver side door instead of entering his truck and because Rogelio drove toward Gonzalez while Gonzalez was holding a shot gun.

All the evidence, even considered in the light most favorable to Gonzalez, shows that Gonzalez shot the rear window on the passenger side of the truck Rogelio was driving, resulting in gunshot injuries to Rosendo. The evidence also shows that the only weapon Gonzalez saw, other than his own, was in the possession of Godinez, who was driving away in the Crown Victoria at the time Gonzalez shot at Rogelio's truck. Although Gonzalez argues Godinez may have passed the handgun to Rogelio, there is no evidence of that happening, nor is there evidence that Rogelio ever possessed a weapon. Further, there is no evidence that Rosendo, the victim, ever possessed a weapon or interacted with Gonzalez in any manner. Although Gonzalez testified he feared for his life, there was no evidence upon which to reasonably base such fear.

That Gonzalez believed Rogelio might shoot him, absent evidence of any overt act or words that would lead Gonzalez to reasonably believe he was in danger, does not entitle Gonzalez to an instruction on self defense. *See Preston v. State*, 756 S.W.2d 22, 25 (Tex. App.—Houston [14th Dist.] 1988, pet. ref'd). And, in the absence of use or attempted use of deadly force by Rogelio or anyone else, the deadly force defense in section 9.32 of the Penal Code is not available, and Gonzalez is not entitled to a self-defense instruction. *See id.*

### CONCLUSION

Viewing the evidence in a light favorable to Gonzalez, we hold the trial court did not err in refusing the self-defense instruction. Accordingly, the trial court's judgment is affirmed.

Karen Angelini, Justice

Do not publish